HUFF, J.:
**384 Sha'quille Washington appeals his conviction and sentence for voluntary manslaughter. He raises numerous arguments concerning the admission or exclusion of evidence and the charging of the jury. We affirm.
FACTUAL/PROCEDURAL BACKGROUND
On August 25, 2013, twenty year-old Herman Manigault (Victim) died after being shot in a parking lot at a club located in a secluded area of Berkeley County known as "A Place in the Woods" (the Club). Victim's cousin, Larry Jenkins, who was with Victim at the Club, described the events of that night. Jenkins testified he and Victim arrived at the Club between 11:00 and 11:30 p.m. At some point, Victim and Jenkins picked up Victim's girlfriend, Arianna Coakley, along with Christina "Taj" Lockwood, and brought them to the Club. Jenkins first saw Washington at the Club when Washington bumped into Jenkins, and Washington, thereafter, began to "stare[ ] us down for a little bit." Jenkins felt a "bad vibe or [that] something wasn't right" from this behavior. Near the end of the night, Jenkins and Victim went outside. At the **385 entrance of the Club, Victim took off his shirt, at which point Victim was "[hit] from behind." Jenkins acknowledged that removal of a shirt suggested there was going to be a fight. Jenkins indicated Victim was struck by more than one person and Jenkins "got into it" with a second individual, because he was not going to let his cousin get jumped. The fight started as a "two-on-one" situation and evolved into "two-on-two" once Jenkins joined the row. Jenkins was wrestling on the ground with the second person, and toward the end of the altercation, Jenkins heard a couple of shots. Jenkins first checked himself to make sure he did not have any stab or bullet wounds. He then observed Victim on the ground and saw Washington shooting toward the ground. Jenkins stated at least one of these shots missed, because he saw the "ground spark up." He clarified he heard one or two shots and then observed *465 Washington shoot at least three more times toward the ground while Victim was on the ground. Jenkins explained that Washington had the gun concealed in his hand, he was shooting like he was not really paying attention, and he was shooting from high and shooting down as he was walking away from Victim. Jenkins could not tell whether the person he fought had a weapon. After the shooting, Jenkins ran to Victim and observed Victim had been shot in the back. By then, Washington was gone. The last time Jenkins saw Washington, it looked like he was headed toward a car. Jenkins did not see where the individual he had been fighting went. Jenkins noticed, aside from being shot in the back, Victim's eye was bruised where he had been hit, and he was bleeding from his face. Jenkins identified Washington in a photo line-up. He testified he was "a hundred percent sure" Washington was the person who shot Victim.[1]
Coakley, who was dating Victim, testified she went to the Club with Victim, Jenkins, and Lockwood on the night in question. While there, she saw Washington, who she had known for about eight years. Washington was at the Club with his uncle, Larry Kinloch. The week before this incident, Kinloch had approached Coakley asking for her number and **386 hitting on her. Victim kept coming up to Coakley while at the Club, telling her "[Washington] keep looking at me," and Coakley advised Victim not to pay any attention to Washington. Around the third time that Victim approached Coakley and noted the situation with Washington, Victim stated to her that he was "going to snap in a moment."
When Victim went outside, Coakley observed Washington and Kinloch immediately trail behind Victim and Jenkins, so Coakley followed them. While still inside the Club, Coakley picked up a glass beer bottle. Once outside, Coakley could not hear what Washington said to Victim, but she heard Victim say "what's up," at which point Washington started hitting Victim with his left hand. Washington hit Victim on the side of his face, and as Victim started sliding down to get away, Washington continued to hit him. Coakley saw Washington hit Victim twice; once in his eye and the other in the back of his head as Victim was spinning around to get away. Victim was on the ground toward the back of a van. Coakley saw Washington initiate the fight, throwing the first punch at Victim. She observed Kinloch hit Jenkins right after Washington hit Victim. The fight moved to the front of the van. Washington turned around and put a gun in Coakley's face when he saw Coakley was about to hit him with the beer bottle, and he said, "I ain't playing, I ain't playing." Coakley, who had been standing on a stoop, dropped the bottle, put up her hands, and slowly backed up to the door. After Washington pointed the gun in Coakley's face, he jumped off the stoop and ran around the right side of the van, which obstructed Coakley's view. Before Coakley could get to the ground to see what was happening, she heard four gunshots. After the shooting stopped, Coakley went around the road to find Victim. Washington and Kinloch were not around the van by the time she got there, apparently having run from the vicinity. Victim did not have a gun, and she did not see anyone else with a gun that night. Coakley acknowledged she could not see the shooting because the van was in her way, and she did not see Washington shoot Victim. There were about four or five people in the vicinity when she heard the shots. Coakley gave police a statement, identifying Washington as the shooter. She also picked Washington out in a photo line-up because he was the person who pointed a gun in her face.
**387 Darius Alls, a cook at the Club that night, testified Victim told him someone was bothering him and he thought his life was in danger. Alls suggested Victim stay at the bar until it closed and they would make sure he got to his car. Victim did not tell Alls who was bothering him.
The State also presented the testimony of Kinloch, who acknowledged being at the Club that night and seeing his nephew-Washington-there *466 a couple of times and talking to him. When asked what he remembered about the shooting, Kinloch stated he did not know there was a commotion going on, and he was just outside smoking a cigarette. Kinloch testified he was standing on the stoop with a bunch of people, he knew nothing about a fight, and he did not see anybody with a gun. While smoking his cigarette, he heard three gunshots. The solicitor then inquired whether Kinloch talked on the phone to his brother-Patrick-on August 27, 2013, while Patrick was locked up in the detention center. Kinloch initially denied talking to him, then admitted talking to Patrick, but denied discussing this incident. Kinloch further denied ever telling anyone he drove Washington away from the scene or telling Patrick he saw Washington with a gun. The solicitor then confronted Kinloch with a recorded jail phone call-ostensibly between Kinloch and Patrick occurring two days after the shooting-which was played for the jury. The solicitor questioned Kinloch regarding the following language used in the call: "I fighting with this fuck-big fucking light-skinned dude, man, tussling with this mother fucker. He got me on the car. I got [Victim] on the car. Me and him going back and forth. Dow, dow, dow." Kinloch agreed the "dow, dow, dow" represented the three shots he either saw or heard. The solicitor asked Kinloch if he knew at least two shots hit Victim, and Kinloch stated he was not sure. The solicitor then asked if it was just coincidence Victim suffered two gunshots, noting the following that Kinloch said in the recorded call: "... that n-word shoot three damn times, man, and they been like-yeah. Head up, boy. I ain't know all that. But I know he had at least two of the three. He hit at least two of the three." Kinloch replied that he was not sure. The solicitor also asked Kinloch whether the word "strap" in the recorded phrase "he keep his strap" referred to a gun. Kinloch denied it was a **388 reference to a gun and, when asked what it meant, stated he did not know.
On cross-examination, defense counsel questioned whether Kinloch's phone conversation with Patrick was really a self-serving means to protect himself by clearing himself and "put[ting] it squarely on the shoulders of [his] nephew," knowing that phone conversations in the detention center were recorded. He also asked Kinloch whether the jailhouse phone conversation's reference to Washington being "already strapped" and Kinloch responding "you know how we do," suggested that Kinloch had "strapped [himself] with a firearm" such that both Washington and Kinloch were "strapped." Kinloch denied this, claiming it was "[j]ust a little figure of speech." Kinloch testified he was not sure when Washington arrived at the club, and he denied the two of them went outside or that he retrieved a .357 Magnum weapon from the car. Defense counsel confronted Kinloch with a part of the conversation in which Kinloch relayed to Patrick, who was in jail on a murder charge, that someone must remain on the outside and that they both could not be in prison for murder. Kinloch agreed he said that, but stated it happened so long ago that he did not remember the phone call. When asked if he shared with an individual named Quinton Grant that he "did the shooting," Kinloch denied doing so. He likewise denied telling Darlene Washington that he "did the shooting." He further denied saying he had a .357 Magnum in his possession, and disagreed that, from the outset, he had been described in the streets as the person who did the shooting. Defense counsel asked Kinloch if he recalled fighting a chubby, light-skinned guy that night, and Kinloch replied that he was drunk. When asked again if he got into an altercation with a chubby, light-skinned boy that night, Kinloch agreed that the individual "[h]ooked up to [him] and [they] just grabbed," but denied any punches were thrown.
Christina Lockwood was also called to testify by the State. She and Coakley were transported to the Club on the night in question by Victim and Jenkins. She saw Washington there that night with Kinloch and another man, whose name she did not know. When asked if she saw Washington shoot Victim, Lockwood said she did not remember. Lockwood testified she observed Coakley get a beer bottle and walk outside. Coakley **389 said something about Victim, and Lockwood walked behind Coakley. She stated she did not see the actual fight, but knew *467 they were fighting because "she said that and Larry also said that, too."[2] She testified she did not see anyone shoot anybody, but she heard the gunshots. Lockwood acknowledged that in her statement to police she indicated Washington shot Victim, but claimed she did not remember that. She also maintained she did not remember including in her statement that she heard Washington talk about shooting someone that night or that Washington and Victim were fighting and "then he pointed the gun and shot." Lockwood stated she was not saying what she wrote in her statement was not the truth, but she did not remember. She also agreed, "If it's written on paper, it's the truth." Lockwood did remember Victim commenting that night about Washington looking or staring at him. When asked about the portions of her statement indicating Washington said he was going to get Victim, that she followed Washington and asked what he was talking about but Washington kept walking, and that Washington and Kinloch followed Victim and Jenkins outside, Lockwood stated she did not remember. When asked what Coakley did once the fight started, Lockwood stated she grabbed a beer bottle and went outside. She did not see Washington point a gun at Coakley, and though her statement indicated he pulled out a gun and said, "Back up, I ain't playing, for real," Lockwood claimed she was "only going off what [Coakley] said." Lockwood admitted her statement said she was standing in the doorway of the Club when she "saw [Washington] shoot [Victim]." When asked if what was on paper was true, Lockwood stated, "As I remember." Lockwood agreed that she stated in her statement that she witnessed the shooting of Victim, that Washington had the gun, and that she saw Washington shoot Victim. She also acknowledged she identified Washington as the shooter of Victim multiple times. Lockwood picked Washington out of a photo line-up and wrote in a statement concerning the line-up that she recognized Washington because she knew him and he was the person she saw kill Victim. Lockwood testified she remembered making the statements, **390 but she did not remember the things she said in the statements.
On cross-examination, when asked if she witnessed Washington shooting Victim, Lockwood stated she did not remember "a lot of stuff," and "[i]f it's on paper and I wrote it that night, if it's true- -I don't know what to say." Lockwood agreed she heard Victim state that he was "about to snap." When asked if she saw the shooting, Lockwood stated she did not remember. However, she thereafter testified she did not see anybody get shot. Although she acknowledged writing in her statement that Washington, Victim, Kinloch and Jenkins were fighting in the Club parking lot, she testified, "I really don't remember anything." She did recall, however, her statement that, after being at the Club about ten minutes, Victim commented, "That 'n' keep looking at me," and Coakley told Victim to pay him no attention.
Jenkins, Coakley and Lockwood all identified Washington as the shooter in a photo line-up. The bullets recovered from Victim's body were fired from the same gun, which was either a .357 Magnum or a .38 Special. After the authorities received information indicating Washington was involved in the shooting, Washington called them and told them he had some information about the matter. He gave a written statement indicating he was outside when he heard a commotion; three people were involved in a fight; the victim's friend was helping him fight the suspect; the suspect had a revolver; after the fight was over, the victim walked away and the suspect fired a shot at him; and as Washington ran, he heard two more shots. Washington denied he had a gun that night and also told the officers neither the victim nor Jenkins had a gun. A gunshot residue test was performed on Washington, but it was done about six hours after the shooting and Washington stated he had washed his hands.[3] No gunshot residue test was performed on Kinloch because he was not identified as being there and possibly involved until much *468 later in the afternoon, well outside the time limits for the test. From their investigation, **391 authorities understood there was a fight involving Jenkins, Kinloch, Victim and Washington on the night in question.
Victim's autopsy revealed he suffered two gunshot wounds to his body, a rectangular shaped laceration to the back of his head and a chipped skull bone caused by blunt force trauma, and lacerations near his left eye. The fatal injury was a close-range gunshot wound to his back, and Victim would have died within minutes of receiving the wound.
After the State rested, the defense called Aja Williams, who testified she was bartending that night at the Club and she served alcohol to Victim. According to Williams, she saw Kinloch at the Club that night, and observed him "walking everywhere [Victim] went." She stated that everywhere Victim went in the Club, Kinloch and Washington followed. The last thing Victim said to Williams was "[Kinloch] going to shoot me, they going to kill me." Williams asked him why, and Victim replied that he did not know. When the Club was shutting down and everyone was walking out, Williams heard gun shots. On cross-examination, Williams confirmed that both Kinloch and Washington followed Victim around that night, and that when Victim spoke to her, he said that "they" were going to kill him. Williams clarified that when Victim said "they," he was referring to Washington and Kinloch. Williams testified that when Victim walked out the door, Washington and Kinloch were six feet behind him.
The defense also called Renard Deveaux, who testified he was walking through the parking lot of the Club that night and was going to the door when he observed a young man standing there with his back to him. As he walked past this person, a guy with short pants, who was standing in front of the first individual, pulled off his shirt like he was about to engage in a fight. The person who pulled off his shirt was in proximity to and standing in the opposite direction of Kinloch. Deveaux "heard them fussing." As he went through the first door of the Club and got to a second door, Deveaux overheard gunshots. He did not see who fired the shots and did not witness the fight.
Robin Williams also testified on behalf of Washington. Robin stated she was walking out of the Club when she looked up and saw a woman holding a glass bottle in Washington's face.
**392 Approximately five seconds later, she heard four shots. She observed Washington run on the second shot. When she heard the last two shots, Washington was running away, and was "not in that proximity" when the last shots were fired. According to Robin, Washington was not near the fight. Robin testified she did not see Washington point a gun in the woman's face, and Washington did not have a gun. She saw Kinloch inside the Club that night, but did not see him when she heard the shots. She did not know if Kinloch was outside during the shooting.
Tyson Singleton was also called by the defense. Singleton testified he was in the parking lot when everyone was leaving the Club and he heard three shots. Washington was in his sight at that time, and Washington was not anywhere near where the shots were fired. Singleton stated that Washington was in the road before the first shot was fired.
Finally, the defense sought the admission of testimony from other witnesses, which the trial court denied. In particular, the defense called Washington's cousin, Kenneth Grant,[4] and elicited testimony from Grant that after the shooting occurred, Kinloch said "he did it." However, the trial court sustained the solicitor's hearsay objection to the testimony and instructed the jury to strike it from consideration. The defense also called Kevin Watson as a witness. Upon determining Watson was in violation of the court's sequestration order, defense counsel was allowed only to proffer his testimony. In his proffer, Watson testified he was at the Club that night when he went outside to smoke a cigarette and observed some fighting and then left. He did not see Kinloch, Washington, or any individuals with a weapon. The defense also recalled *469 the forensic pathologist who performed Victim's autopsy in an attempt to admit a toxicology report and testimony concerning Victim's blood alcohol level. The trial court, however, sustained the solicitor's objection to such.
Following closing arguments, the trial court charged the jury, including an instruction on "the hand of one is the hand **393 of all" at the behest of the State. However, the court declined to charge the jury on self-defense, as requested by the defense. After the matter was submitted to the jury, following several hours of deliberation and toward late afternoon, the jury sent a note indicating it was deadlocked. Over defense counsel's objection, the trial court gave the jury an Allen charge and instructed the jurors to return in the morning to resume deliberations. The next day the jury returned a verdict, finding Washington guilty of voluntary manslaughter. The trial court sentenced him to thirty years in prison.
ISSUES
1. Whether the trial court erred in refusing to admit the testimony of defense witness Grant that Kinloch told Grant he committed the shooting.
2. Whether the trial court erred in refusing to admit a toxicology report and testimony of the forensic pathologist concerning the report's findings as to Victim's blood alcohol level.
3. Whether the trial court erred in excluding the testimony of defense witness Watson, who had been present in the courtroom briefly in violation of the trial court's sequestration order.
4. Whether the trial court erred in refusing the defense's request for a jury charge on self-defense.
5. Whether the trial court erred in granting the State's request for a jury charge on accomplice liability.
6. Whether the trial court erred in giving an Allen charge at the close of the day's deliberations, then excusing the jury for the night.
STANDARD OF REVIEW
In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous. State v. Baccus , 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). The admission or exclusion of evidence is within the discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion.
**394 State v. Winkler , 388 S.C. 574, 583, 698 S.E.2d 596, 601 (2010). An abuse of discretion occurs when the trial court's conclusions either lack evidentiary support or they are controlled by an error of law. Id. "An appellate court will not reverse the trial [court's] decision regarding a jury charge absent an abuse of discretion." State v. Mattison , 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010).
LAW/ANALYSIS
I. Refusal to Admit Testimony of Defense Witness Grant
As noted, defense counsel asked Kinloch if he shared with Grant that "[he] did the shooting." Kinloch denied this. Defense counsel also asked if, when the shooting took place, he ran and Grant assisted him in getting away from the shooting, and Kinloch likewise denied this. Kinloch also disputed that he saw Grant after the shooting that night. Later, the defense called Grant to the stand. When asked if he had any information concerning this case, Grant stated "[T]hat night after it happened ... I came back because [Kinloch] called me." The solicitor promptly objected on hearsay grounds. The trial court asked defense counsel if there was an applicable exception to the rule against hearsay, and counsel responded there was, stating, "[Kinloch] already testified." The trial court sustained the solicitor's objection. When defense counsel began to ask Grant, "As a result of the conversation with a specific individual, you - -," the solicitor again objected on hearsay grounds, but the trial court noted defense counsel may be able to ask the question without eliciting hearsay. Defense counsel then asked Grant, "so you returned to the club," to which Grant responded, "Yes. Yes. Larry Kinloch told - - *470 said he did it."[5] Defense counsel then asked, "Larry [Kinloch] said he did it?" Grant responded, "He said he did it." Following the solicitor's objection, Grant again stated, "He told me he did it." The trial court asked counsel to approach, and an off-the-record bench conference was held. Thereafter, the trial court instructed the jury to strike the last statement the witness made. Defense counsel asked that they be allowed to approach the bench, and another off-the-record bench conference **395 was held. Defense counsel then resumed questioning Grant. Grant stated he did not witness the shooting, but learned of it ten to fifteen minutes after it happened. He further stated he saw Kinloch twenty to twenty-five minutes after the shooting. Defense counsel then asked, "And that's when you heard what he said?" Grant replied, "Yes." Defense counsel asked, "That, in fact, he had [sic] did it?" Grant replied, "Yes." The solicitor again objected, and the trial court sustained the objection and instructed the jury to strike the testimony from consideration.[6] On redirect, defense counsel asked Grant why he was there, and Grant began to respond, "To say that [Kinloch] - -," at which point the solicitor objected. The trial court sustained the objection, instructing the witness, "You cannot testify as to what someone told you, unless there is an exception and I have established there is no exception." Defense counsel then inquired, "Judge, what about Rule 803, presence [sic] sense - -," at which point a bench conference was held off the record. No further evidence was elicited on the subject and no more arguments were made at that time. However, after the State and the defense rested, during the charge conference defense counsel, in arguing against inclusion of a "hand of one" charge, maintained the evidence did not support an accomplice liability charge because there was no evidence Kinloch shot anyone. In making the argument, defense counsel maintained, "The only possible witness that had a chance to say that under an utter excited [sic] exception to the hearsay rule, the jury was instructed to disregard that completely from their deliberation and ... [could not] discuss the fact that ... Grant said ... I heard [Kinloch] say he did it."
Washington contends the trial court erred in refusing to admit Grant's testimony that Kinloch told him he committed the shooting. He first argues Grant's testimony to that effect was not hearsay because it qualified as a prior inconsistent statement under Rule 801 of our rules of evidence. He further contends, even if the trial court correctly found the statement **396 was hearsay, it erred in its conclusion that it did not fit into any hearsay exception. In particular, Washington argues the statement Kinloch made to Grant was admissible under evidentiary Rule 803 exceptions (1) present sense impression and (2) excited utterance. In response to the State's appellate argument that the only preserved argument with respect to this issue is that premised on the present sense impression under Rule 803, Washington argues the other two bases are preserved because they are apparent from the record. He asserts the trial court limited defense counsel in placing objections on the record, repeatedly informing counsel it would not allow "speaking objections," cutting off counsel before the objection could be fully stated for the record, and requiring the objection be argued in off-the-record bench conferences. Washington maintains defense counsel's specific reference to Kinloch already having testified clearly reveals the basis of the argument was that of a prior inconsistent statement. He contends defense counsel's excited utterance argument was made during the bench conference on the matter, as was revealed on the record during his argument on jury charges when he noted his "utter excited [sic] exception to the hearsay rule."
" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *471 to prove the truth of the matter asserted." Rule 801(c), SCRE. "The rule against hearsay prohibits the admission of evidence of an out of court statement to prove the truth of the matter asserted unless an exception to the rule applies." State v. Price , 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006). A statement that is admissible because it is "not hearsay" under Rule 801(d), SCRE, or because it falls within a Rule 803, SCRE exception may be used substantively to prove the truth of the matter asserted. State v. Stahlnecker , 386 S.C. 609, 622-23, 690 S.E.2d 565, 572-73 (2010) ; State v. Dennis , 337 S.C. 275, 284, 523 S.E.2d 173, 177 (1999).
A. Prior Inconsistent Statement
We question whether Washington's prior inconsistent statement argument is preserved for our review. There is no indication from the record that defense counsel ever raised this as a basis for admission of Grant's testimony in the face of **397 the State's hearsay objection. We acknowledge, and find problematic, that the trial court did, throughout the trial, indicate it would not allow "speaking objections," and numerous bench conferences were held off the record. However, it does not appear the trial court implemented its "no speaking objections" rule concerning this particular matter. After the State objected to the proposed testimony on the basis of hearsay, the trial court asked defense counsel if he had any exceptions, to which counsel only replied, "[Kinloch] already testified." Though a party need not use the exact name of a legal doctrine in order to preserve it, it must be clear by the record that the argument has been presented on the ground argued on appeal. State v. Dunbar , 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003). We acknowledge three bench conferences were held off the record during this testimony, however, one was instigated by defense counsel asking if he could approach the bench and another occurred in regard to defense counsel's on-the-record assertion that Rule 803's present sense impression exception applied, an argument which is clearly preserved and is addressed below. Further, there is no indication the trial court prohibited defense counsel from stating his arguments on the record. See Smalls v. State , 422 S.C. 174, 182 n.3, 810 S.E.2d 836, 840 n.3 (2018) ("When a conference takes place off the record, it is trial counsel's duty to put the substance of the discussion and the trial court's ruling on the record.").
At any rate, even assuming for the sake of argument that the issue is properly preserved, we find no abuse of discretion by the trial court because no proper foundation was laid for admission of the evidence as a prior inconsistent statement. "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with the declarant's testimony." Rule 801(d)(1)(A), SCRE. "The South Carolina rule differs from the federal rule in that a proper foundation must be laid before admitting a prior inconsistent statement." State v. McLeod , 362 S.C. 73, 81, 606 S.E.2d 215, 219 (Ct. App. 2004). "Under the rules of evidence, a prior inconsistent statement may be admitted when the proper foundation has been laid" pursuant to Rule 613(b), SCRE.
**398 State v. Stokes , 381 S.C. 390, 398, 673 S.E.2d 434, 438 (2009). This rule states in pertinent part as follows:
Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is advised of the substance of the statement, the time and place it was allegedly made, and the person to whom it was made, and is given the opportunity to explain or deny the statement. If a witness does not admit that he has made the prior inconsistent statement, extrinsic evidence of such statement is admissible.
Rule 613(b), SCRE.
Rule 613(b) specifically requires that the witness be advised of these matters and be given the opportunity to explain or deny the statement before extrinsic evidence of a prior inconsistent statement may be admitted into evidence on this basis. During cross-examination of Kinloch, defense counsel asked him only if he shared with Grant that he "did the shooting," whether he ran and Grant assisted him in getting away from the shooting, and whether he saw Grant "[a]fter the shooting that night." These general questions are insufficient *472 to lay the proper foundation. Even if defense counsel's question of whether Kinloch shared with Grant that he did the shooting was sufficient to advise Kinloch of the substance of the statement and provide him an opportunity to explain or deny the statement, counsel did not lay the foundation as to the time and place the statement was allegedly made . Though defense counsel asked Kinloch if Grant assisted him in getting away after the shooting and whether he saw Grant that night, these questions did not reference his alleged statement to Grant and did not advise Kinloch of the time and place he allegedly made the statement to Grant. Additionally, Grant testified that the statement was not made to him at the Club, but was made at Kinloch's home some twenty to twenty-five minutes after the shooting. Accordingly, while Washington argues the question concerning whether Grant assisted Kinloch in getting away from the shooting provided advisement concerning the place the statement was made, this is contrary to Grant's testimony as to the place the statement was allegedly made. **399 B. Present Sense Impression
Rule 803, SCRE, provides a "present sense impression" exception to the rule against hearsay, which is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), SCRE. "There are three elements to the foundation for the admission of a hearsay statement as a present sense impression: (1) the statement must describe or explain an event or condition; (2) the statement must be contemporaneous with the event; and (3) the declarant must have personally perceived the event." State v. Parvin , 413 S.C. 497, 503, 777 S.E.2d 1, 4 (Ct. App. 2015) (quoting State v. Hendricks , 408 S.C. 525, 533, 759 S.E.2d 434, 438 (Ct. App. 2014) ).
As previously noted, it is clear trial counsel argued to the trial court that Grant's testimony concerning Kinloch's statement was admissible under the present sense impression exception of Rule 803, SCRE. Accordingly, this argument is preserved on appeal. However, we find no error in the trial court's denial of admission of Grant's testimony on this basis.
"The rationale for admissibility [under the present sense impression exception] is that the statement is reliable, since it is contemporaneous with the event or occurrence and there was no time for reflection, faulty recollection, or deliberate misrepresentation." 31A C.J.S. Evidence § 505 (2018). "The rule[ ] generally refer[s] to a declaration made 'immediately thereafter,' but this does not necessarily mean 'instantly thereafter' or precisely at the same moment." Id. However, "[s]tatements of past events are excluded, because it is more likely that statements that are not contemporaneous are calculated interpretations of events rather than near simultaneous perceptions." Id. "Present sense impression evidence differs from the excited utterance exception, since the excited utterance exception requires that the shock or excitement of an incident or event trigger the outburst, while the present sense impression exception does not require that the declarant be excited." Id. "The present sense impression exception requires a closer time proximity than the excited utterance one." Id.
"The theory supporting the present sense impression exception is that substantial contemporaneity of the event and **400 the statement negates the likelihood of memory deficiencies or deliberate misstatements." 2 Wharton's Criminal Evidence § 6:19 (15th ed.)"Its use is limited to statements made while the witness is perceiving an event or condition or immediately thereafter." Id. "If the statement describes something that happened at an earlier time, it does not fit within this exception and will not be admitted as a present sense impression." Id. "The basis of the present sense impression exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious misrepresentation." State v. Pickens , 346 N.C. 628, 644, 488 S.E.2d 162, 171 (1997).
Here, the alleged statement to Grant was not made while Kinloch was perceiving the event or immediately thereafter such that it could be said to meet the requirement that it was contemporaneous with the event in *473 order to be admissible under the present sense impression exception. The alleged statement clearly was not made while Kinloch was perceiving the event. Thus, it could only be admissible under the rule if made "immediately thereafter." Rule 803(1), SCRE. This court has noted, "[o]ur courts have not delineated a time frame that would constitute 'immediately thereafter'; however, this court has held a statement given nearly ten hours after the perceived incident cannot be admitted under Rule 803(1)." Parvin , 413 S.C. at 503, 777 S.E.2d at 4 (citing State v. Burroughs , 328 S.C. 489, 499, 492 S.E.2d 408, 413 (Ct. App. 1997) )[7] . However, Parvin and Burroughs certainly do not provide that anything less than ten hours would qualify the statement as having been made contemporaneous with or immediately after the event or condition was perceived. Grant's testimony indicates the alleged statement was not made until Kinloch had left the scene and arrived at his home, well after the shooting. While twenty to twenty-five minutes is clearly a significantly shorter amount of time than ten hours, we find, under the circumstances, such time frame does not qualify as "immediately" after the event. Notably, the time between the event and the alleged statement does not negate **401 or reduce the likelihood of deliberate misstatements. Additionally, Burroughs provides it is appropriate for the appellate courts to look to South Carolina pre-Rules res gestae cases-prior to the adoption of Rule 803-in analyzing the present sense impression exception to the hearsay rule. Burroughs , 328 S.C. at 499, 492 S.E.2d at 413. In Wilson v. Childs , 315 S.C. 431, 439, 434 S.E.2d 286, 291-92 (Ct. App. 1993) -a case dealing with res gestae issues prior to the adoption of Rule 803(1) -this court upheld the trial court's ruling excluding testimony that the decedent told his daughter shortly before his death that he told the defendant doctor about his bleeding condition. We noted the trial court reasoned the testimony was hearsay and was not admissible as a present sense impression because the decedent had made the statement in "reflection of past events." Here, the statement attributed to Kinloch was a statement reflecting something that occurred in the past; i.e., that he had shot Victim. It was not the revelation of a contemporaneous event. Considering that the alleged statement was made some twenty to twenty-five minutes after the event and after Kinloch had left the scene and gone home, there was time for reflection and deliberate misrepresentation, and it was not made within such time as to negate the likelihood of a deliberate misstatement. Thus, the alleged statement was not contemporaneous with the event and, therefore, does not qualify as a present sense impression exception to the rule against hearsay. Accordingly, we find no abuse of discretion in the trial court's refusal to admit the testimony under the present sense impression exception to the hearsay rule. See State v. Johnson , 413 S.C. 458, 466, 776 S.E.2d 367, 371 (2015) ("The admission or exclusion of evidence rests in the sound discretion of the trial [court], and will not be reversed on appeal absent an abuse of discretion.").
C. Excited Utterance
As with Washington's prior inconsistent statement argument, there is some question as to whether his assertion that Grant's testimony was admissible under the excited utterance exception to the rule against hearsay is sufficiently preserved for our review. There is no indication defense counsel raised the excited utterance exception to the hearsay rule at the time the trial court ruled Grant's testimony concerning Kinloch's **402 alleged statement was inadmissible. However, defense counsel's argument on the propriety of an accomplice liability charge does provide some indication that defense counsel may have, at some point during discussion of the matter, made an argument to the trial court that Grant's testimony regarding Kinloch's alleged statement was admissible under this exception. Given the trial court's propensity to hold off-the-record bench conferences and the fact that there is some indication from trial counsel's argument during the charge *474 conference that an excited utterance exception to the rule against hearsay may have been raised as a basis for admission of Grant's testimony, we find it appropriate to address the argument. See Atl. Coast Builders & Contractors, LLC v. Lewis , 398 S.C. 323, 330, 730 S.E.2d 282, 285 (2012) (finding it to be "good practice for [the appellate court] to reach the merits of an issue when error preservation is doubtful)"; id. at 333, 730 S.E.2d at 287 (Toal, C.J., concurring in result in part and dissenting in part) ("[W]here the question of preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation."). On the merits, however, we find no error.
Evidentiary Rule 803 also provides an "excited utterance" exception to the rule against hearsay. An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), SCRE.
Three elements must be met for a statement to be an excited utterance: (1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement; and (3) the stress of excitement must be caused by the startling event or condition.
Stahlnecker , 386 S.C. at 623, 690 S.E.2d at 573. "In determining whether a statement falls within the excited utterance exception, a court must consider the totality of the circumstances." State v. Sims , 348 S.C. 16, 20, 558 S.E.2d 518, 521 (2002). The passage of time between the startling event and the statement is one factor to consider, but it is not the dispositive factor.
**403 Stahlnecker , 386 S.C. at 623, 690 S.E.2d at 573. "Other factors useful in determining whether a statement qualifies as an excited utterance include the declarant's demeanor, the declarant's age, and the severity of the startling event." Id. (quoting Sims , 348 S.C. at 22, 558 S.E.2d at 521 ). "The excited utterance exception is based on the rationale that 'the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication.' " State v. Ladner , 373 S.C. 103, 116, 644 S.E.2d 684, 691 (2007) (quoting Dennis , 337 S.C. at 284, 523 S.E.2d at 177 ). The determination of whether a statement qualifies as an excited utterance exception "is left to the sound discretion of the trial court." Sims , 348 S.C. at 21, 558 S.E.2d at 521.
In the present case, there is no evidence Kinloch made the alleged statement while under the stress of excitement. See Stahlnecker , 386 S.C. at 623, 690 S.E.2d at 573 (holding the following three elements must be met for a statement to qualify as an excited utterance: "(1) the statement must relate to a startling event or condition; (2) the statement must have been made while the declarant was under the stress of excitement ; and (3) the stress of excitement must be caused by the startling event or condition (emphasis added) ). According to Grant, the statement was not made at the scene of the shooting, but was made at least twenty to twenty-five minutes later at Kinloch's house. Though not dispositive, time is a factor to be considered in the totality of the circumstances. See id. (noting, though not dispositive, the passage of time between the startling event and the statement is a factor to consider in determining whether a statement is an excited utterance). Further, there is no evidence Kinloch's demeanor was such as to indicate the alleged statement was an excited utterance. See id. (noting one of the factors useful in determining whether a statement qualifies as an excited utterance is the declarant's demeanor). Nor is there evidence that the shooting suspended Kinloch's process of reflective thought, reducing the likelihood of fabrication. See Ladner , 373 S.C. at 116, 644 S.E.2d at 691 ("The excited utterance exception is based on the rationale that 'the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication.' " (quoting Dennis , 337 S.C. at 284, 523 S.E.2d at 177 ) ). Accordingly, we find no abuse of the **404 trial court's discretion in declining to find the statement fell within the excited utterance exception.
II. Refusal to Admit Toxicology Evidence
Washington challenges the trial court's refusal to admit evidence of Victim's *475 intoxication. The record reflects the following in regard to Victim's alcohol consumption and level of intoxication on the night in question: Aja Williams testified she was bartending at the Club that night, she served alcohol to Victim, and she did not believe Victim was "heavily intoxicated" that night when she served him. Jenkins testified he did not witness Victim drinking that night. Coakley, however, confirmed that Victim was drinking that night. Alls, the cook at the Club, testified he could not say whether Victim appeared to be under the influence that night, because he-Alls-"was probably under the influence [himself]." The defense re-called the forensic pathologist who performed Victim's autopsy in an attempt to admit a toxicology report and testimony concerning Victim's blood alcohol level. The solicitor objected, citing Rule 404, SCRE.[8] The trial court sustained the objection, stating "[t]here has been abundant testimony as to the fact that there was drinking or not drinking by the victim." In a proffer, the doctor testified Victim had a blood alcohol level of .235, which was high. While the forensic pathologist surmised Victim would have acted intoxicated and his judgment would have been impaired, she noted she could not predict, from that level, whether Victim would have acted in an aggressive manner or one that was subdued.
Washington argues the trial court erred in refusing to admit the toxicology report and testimony concerning Victim's blood alcohol content. He argues the .235 level was relevant, as it was probative of the issue of whether Victim provoked the altercation or instigated the fight outside the Club. Washington contends Rule 404 is inapplicable, asserting intoxication is not a matter of character, nor is it a crime, wrong, or other bad act. He further contends the erroneous ruling was prejudicial inasmuch as a person with such a high alcohol content **405 would have a decreased sensitivity to pain, lowered inhibitions, a tendency toward overreaction to a perceived affront, and aggressive or violent behavior. Washington maintains evidence of Victim's extreme intoxication likely would have influenced the jury's deliberations as to who instigated the fight, and it likely would have altered the outcome of the trial.
Generally, all relevant evidence is admissible. Rule 402, SCRE. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "Unfair prejudice means an undue tendency to suggest decision on an improper basis." State v. Wiles , 383 S.C. 151, 158, 679 S.E.2d 172, 176 (2009). "The relevance, materiality, and admissibility of evidence are matters within the sound discretion of the trial court and a ruling [on such] will be disturbed only upon a showing of an abuse of discretion." State v. Shuler , 353 S.C. 176, 184, 577 S.E.2d 438, 442 (2003). An appellate court reviews a trial court's Rule 403, SCRE ruling pursuant to an abuse of discretion standard and gives great deference to the trial court's determination. State v. Collins , 409 S.C. 524, 534, 763 S.E.2d 22, 28 (2014). Thus, "[a] trial [court's] decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in exceptional circumstances." Id. (quoting State v. Adams , 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct. App. 2003) ). "To warrant reversal based on the admission or exclusion of evidence, the complaining party must prove both the error of the ruling and the resulting prejudice." State v. Howard , 384 S.C. 212, 221, 682 S.E.2d 42, 47 (Ct. App. 2009) (quoting State v. Douglas , 367 S.C. 498, 508, 626 S.E.2d 59, 64 (Ct. App. 2006) ).
Initially, we find no preservation problem with this issue, as implied by the State. Notably, the State argues the trial court's ruling *476 reflects it sustained the objection to the evidence based on Rule 403, and this is the issue addressed on appeal. **406 On the merits, we find no abuse of discretion in the trial court's refusal to admit toxicology evidence of the Victim. First, we question the relevance of the toxicology evidence. See Rule 401, SCRE (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Washington asserts the evidence is relevant as it is probative of the issue of whether Victim provoked the altercation or instigated the fight outside the Club and would show Victim had a decreased sensitivity to pain, lowered inhibitions, a tendency toward overreaction to a perceived affront, and aggressive or violent behavior. There is no evidence in the record that Victim was the aggressor in the physical altercation. Rather, the evidence adduced at trial demonstrates that Victim was followed by Washington and stared at by him in the Club that night, he expressed fear that Washington and Kinloch were going to kill him, Victim was followed outside by Washington and Kinloch, and, once outside, Washington struck the first blow, hitting Victim from behind. While there is evidence Victim removed his shirt, this is probative of his willingness to fight but not necessarily that he provoked the fight. Nonetheless, even assuming removal of his shirt is evidence that Victim was the aggressor, no evidence was offered to support Washington's assertion that Victim's intoxication would have exhibited in him a decreased sensitivity to pain, lowered inhibitions, a tendency toward overreaction to a perceived affront, and aggressive or violent behavior. Rather, this is mere speculation. In fact, the forensic pathologist's proffered testimony was that she could not predict from Victim's high alcohol level whether Victim would have acted in an aggressive manner or in a subdued one. Finally, even assuming there was some relevance to evidence of Victim's toxicology at the time of his death, we conclude the minimal probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. Notably, while Washington was not successful in admission of the extent of Victim's intoxication, he did elicit evidence that Victim had been drinking that night. Further, as noted, there is no evidence Victim's intoxication would have led him to provoke the fight, so the evidence is of minimal probative value. Based on our standard **407 of review and the deference accorded the trial court, we find no abuse of discretion. Finally, we question whether Washington can show prejudice from the exclusion of this evidence. As noted by the State, the jury returned a voluntary manslaughter verdict, acquitting Washington of murder. Accordingly, it necessarily found Washington had sufficient legal provocation. See State v. Smith , 391 S.C. 408, 412-13, 706 S.E.2d 12, 14 (2011) ("Voluntary manslaughter is the intentional and unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation.").
III. Violation of Sequestration Order
Washington next challenges the trial court's exclusion of a defense witness' testimony based on violation of the court's sequestration order. The record reflects the trial court ordered sequestration of the witnesses. Thereafter, during a pretrial hearing, the solicitor noted some of the defense witnesses were in the courtroom. Defense counsel countered that some of the witnesses in there were witnesses of the State. The trial court then read a list of witnesses and asked them to stand if their name was called. Included in the list was Kevin Watson, although it does not appear he responded. The court then instructed the three witnesses who stood about the sequestration order. The court noted there were many names on the list called to which no one responded and asked the solicitor and defense counsel to look around the courtroom for any of those individuals. Defense counsel responded, if his witnesses did not stand when called, they were not present. The solicitor did not believe any of the State's witnesses were still present. Shortly before opening arguments the next day, the trial court again noted the sequestration order was in effect and instructed the solicitor and defense counsel to ensure no one was in the courtroom who should not be.
*477 After the State rested, the defense called Kevin Watson as its first witness. After a couple of preliminary questions, the solicitor interrupted the examination, informing the court he had been informed Watson was present in violation of the sequestration order. When questioned by the trial court, Watson initially stated he had not been in the courtroom to hear any testimony, the first time he came into the courtroom was that day, and he had not sat and listened to any of the **408 testimony. The State then presented the testimony of Lieutenant Mark Hamilton, who stated he thought he saw Watson in the courtroom earlier on a break. When asked by the court if he was in the courtroom, Watson replied that he was "here today" and acknowledged he saw "a thing on the screen." Watson agreed he was there when Detective Shuler was testifying and he saw a video being played. The record reflects the video being played during Shuler's testimony was that of Washington's interview, which included his statement to the authorities.
The trial court found Watson indicated he saw the video, which was exactly what the rule of sequestration was in place to prevent, and declined to permit Watson to testify, but it allowed defense counsel to proffer his testimony for the record. Defense counsel protested that when the matter commenced Watson "was not listed as one of the witnesses" on the State's witness list or the defense's witness list and, therefore, Watson would not have been in a position to receive the sequestration instruction. The trial court noted defense counsel, as an officer of the court, knew about the rule of sequestration and should have advised accordingly. Defense counsel maintained that Watson did not come to him "until today and share with [him] he was going to testify," so counsel did not believe there was a need to consider him sequestered. The trial court nevertheless affirmed its ruling.
On appeal, Washington contends the trial court erred in excluding Watson's testimony, arguing violation of the order was minor since Watson was present only for the playing of the video but heard no testimony. He further argues, because Watson had not been present in the earlier days of the trial, he had not been made aware of the sequestration order. Thus, his violation of the order was unknowing and unintentional. Washington maintains, under these circumstances, the trial court abused its discretion in excluding the witness. He also contends exclusion of Watson's testimony was prejudicial, as his proffer showed Watson witnessed the fight and did not see Washington or Kinloch with a weapon, which was in sharp contrast to Coakley and Jenkins' testimony concerning Washington having a gun.
**409 "Whether a witness should be exempted from a sequestration order is within the trial court's discretion." State v. Singleton , 395 S.C. 6, 15-16, 716 S.E.2d 332, 337 (Ct. App. 2011) (quoting State v. Tisdale , 338 S.C. 607, 616, 527 S.E.2d 389, 394 (Ct. App. 2000) ). "The decision whether to waive a sequestration order for witnesses present during the trial rests in the sound discretion of the trial [court]." State v. Huckabee , 388 S.C. 232, 240, 694 S.E.2d 781, 785 (Ct. App. 2010) (quoting State v. Saltz , 346 S.C. 114, 126, 551 S.E.2d 240, 247 (2001) ).
The purpose of the exclusion rule is, of course, to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial; and if a witness violates the order he may be disciplined by the court. The question of the exclusion of the testimony of the offending witness, however, depends upon the particular circumstances and lies within the sound discretion of the trial court.
Id. at 241, 694 S.E.2d at 785 (quoting U.S. v. Leggett , 326 F.2d 613, 613-14 (4th Cir. 1964) ).
We find no reversible error in the trial court's exclusion of Watson's testimony. First, though it does not appear that Watson was aware of the sequestration order, the trial court found defense counsel, as an officer of the court, was responsible for enforcing the order involving its witnesses. Washington does not challenge this determination by the trial court on appeal. Though defense counsel asserted at trial that Watson was not on any of the witness lists when the matter commenced, the record clearly shows that Watson was, in fact, listed as a witness and his name was called by the court in an attempt *478 to enforce the sequestration order. Further, while Watson denied he heard any testimony, he acknowledged he was present while the officer was on the stand and the video of Washington's interview was played for the jury. Accordingly, the potential existed for Watson to conform his testimony to information presented in Washington's video-recorded statement. Given the trial court's discretion in deciding whether to exclude testimony of a witness in violation of a sequestration order, we find no error. At any rate, even assuming arguendo the trial court abused its discretion, we do not believe Washington was prejudiced by the exclusion. Watson's proffered **410 testimony established only that he was present at the Club that night, he observed some fighting, and he did not see Kinloch, Washington, or any individuals with a weapon. This testimony does not establish that no one had a weapon, but only that Watson did not see anyone with a weapon. Further, Watson's testimony was, at best, cumulative to witness Robin's testimony that Washington did not have a gun.
IV. Refusal to Charge Self-Defense
Washington next contends the trial court erred in refusing to charge the jury on the law of self-defense. We disagree.
Washington argues the evidence was sufficient to support a charge of self-defense. He asserts testimony was presented tending to establish Victim provoked the altercation based on testimony that Kinloch had "hit" on Victim's girlfriend, Coakley, the week before and Victim was bothered and was about to snap before he went outside and removed his shirt. Further, he maintains Coakley's testimony establishes he drew the gun to defend himself after Coakley raised a beer bottle to strike him.
"The law to be charged to the jury is determined by the evidence presented at trial." State v. Gaines , 380 S.C. 23, 31, 667 S.E.2d 728, 732 (2008). "If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial [court's] refusal to do so is reversible error." State v. Light , 378 S.C. 641, 650, 664 S.E.2d 465, 469 (2008). "A self-defense charge is not required unless the evidence supports it." State v. Santiago , 370 S.C. 153, 159, 634 S.E.2d 23, 26 (Ct. App. 2006). To warrant reversal, a trial court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. Id.
Though self-defense was, at one time, an affirmative defense in this State which placed the burden on a defendant to establish it by a preponderance of the evidence, our law now "requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt." State v. Wiggins , 330 S.C. 538, 544, 500 S.E.2d 489, 492-93 (1998). To raise self-defense, the defendant must produce some evidence from which the jury could have a reasonable doubt as to guilt.
**411 See State v. Grooms , 343 S.C. 248, 254, 540 S.E.2d 99, 102 (2000) ("A defendant is not required to establish self-defense by a preponderance of the evidence; instead, the defendant must only produce evidence which causes the jury to have a reasonable doubt as to his guilt.").
To establish self-defense in South Carolina, four elements must be present: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger.
State v. Slater , 373 S.C. 66, 69-70, 644 S.E.2d 50, 52 (2007).
"Any act of the accused in violation of law and reasonably calculated to produce *479 the occasion amounts to bringing on the difficulty and bars his right to assert self-defense as a justification or excuse for a homicide." State v. Bryant , 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999). "Mutual combat exists when there is 'mutual intent and willingness to fight.' " State v. Jackson (D. Jackson) , 355 S.C. 568, 571, 586 S.E.2d 562, 563 (2003) (quoting State v. Graham , 260 S.C. 449, 450, 196 S.E.2d 495, 495 (1973) ). "Mutual intent is 'manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat.' " Id. "Mutual combat bars a claim of self-defense because it negates the element of 'not being at fault.' " Id.
"A defendant is not required to retreat if he has 'no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in [the] particular instance.' " State v. Dickey , 394 S.C. 491, 502, 716 S.E.2d 97,102 (2011) (alteration in original) (quoting **412 Wiggins , 330 S.C. at 545, 500 S.E.2d at 493 ). In order to satisfy the fourth element of self-defense, there must be evidence the defendant:
had no other probable means of escape except to take the life of his assailant or stated another way, that he had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily harm than to act as he did in the particular instance; that it is one's duty to avoid taking human life where it is possible to prevent it even to the extent of retreating from his adversary unless by doing so the danger of being killed or suffering serious bodily harm is increased or it is reasonably apparent that such danger would be increased.
State v. Jackson (H. Jackson) , 227 S.C. 271, 279, 87 S.E.2d 681, 685 (1955). "The law says if one can give back or step aside, or retreat without increasing his danger, and thus avoid taking human life, it is his duty to do so, and unless he has done so, it will not permit his plea of self-defense." State v. Burriss , 334 S.C. 256, 268, 513 S.E.2d 104, 111 (1999) (Burnett, J., dissenting) (quoting State v. George , 119 S.C. 120, 121, 111 S.E. 880, 880 (1921) ). "Unless the incident occur[s] in the accused's home or business or on the curtilage thereof, the accused generally has a duty to retreat." State v. Jackson (C. Jackson) , 384 S.C. 29, 37, 681 S.E.2d 17, 21 (Ct. App. 2009).
First, we find there is no evidence Washington was without fault in bringing on the difficulty. We acknowledge there is a wide range of evidence-from Washington not having been the person who shot Victim to Washington shooting Victim after Coakley attempted to hit him with a beer bottle and after Washington and Victim engaged in a physical altercation. Accepting evidence that Washington was not the individual who shot Victim, self-defense would not be applicable. The only evidence regarding Washington's interaction with Victim that night shows Washington followed Victim around in the Club and stared him down throughout the night; Washington followed Victim out the door as everyone was leaving the Club; Washington threw the first punch, hitting Victim from behind once Victim removed his shirt and hitting Victim at least twice; Victim was on the ground, and after Washington pointed the gun in Coakley's face, Washington jumped off the stoop and ran around the van, and before **413 Coakley could get to the ground to see what was happening, four gunshots rang out; and immediately after Victim was shot, Washington was seen heading toward a car. Based upon evidence that Washington shot Victim only after the two engaged in a fight upon Victim removing his shirt, we agree with the State that this evidence, at best, indicates mutual combat, which defeats a claim of self-defense. See D. Jackson , 355 S.C. at 571, 586 S.E.2d at 563 ("Mutual combat exists when there is 'mutual intent and willingness to fight.' Mutual intent is 'manifested by the acts and conduct of the parties and the circumstances attending and leading up to the combat.' Mutual combat bars a claim of self-defense because it negates the element of 'not being at fault.' " (citations omitted) (quoting Graham , 260 S.C. at 450, 196 S.E.2d at 495 (1973) ) ). Further, we do not believe evidence that Coakley attempted to strike Washington with the beer bottle is sufficient to show Washington was not at fault in bringing on the difficulty. We *480 agree with the State that Coakley's testimony demonstrates she raised the bottle in an attempt to hit Washington only after he had already struck Victim, and Washington threw the first punch at Victim. We also note there is no evidence Victim was aware that Kinloch had recently "hit" on his girlfriend. Rather, Coakley stated to the contrary.
Second, there is no evidence Washington was in actual imminent danger of losing his life or sustaining serious bodily injury or that he actually believed he was in imminent danger of losing his life or sustaining serious bodily injury. As noted, the only evidence regarding Washington's interaction with Victim shows Washington followed Victim around the Club staring at him and followed Victim out the door as he left the Club that night. Even though there is evidence Victim removed his shirt, Washington threw the first punch, hitting Victim from behind. He continued to hit Victim, causing him to fall to the ground and, after pointing the gun in Coakley's face, Washington jumped off the stoop and ran around the van, at which point Victim was shot. There is no evidence that Victim ever struck Washington, much less that Washington was in actual imminent danger of losing his life or sustaining serious bodily injury. Further, there is no evidence Washington believed he was in actual imminent danger of losing his life or sustaining serious bodily injury. See **414 State v. Bruno , 322 S.C. 534, 536, 473 S.E.2d 450, 452 (1996) ("[Appellant] was not entitled to a self-defense charge, because he presented no evidence that he believed he was in imminent danger of losing his life or sustaining serious bodily injury.").
Third, even assuming there is evidence Washington believed he was in imminent danger, the evidence does not show a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life. As noted above, the only evidence concerning the altercation between Washington and Victim reveals Washington struck Victim and Victim ended up on the ground before he was shot. Further, even considering the fact that Coakley raised a glass bottle in an attempt to strike Washington as he was fighting Victim, the evidence shows Coakley dropped the bottle and backed away toward the door after Washington put the gun in her face, and Washington then ran back toward the Victim, firing the weapon before Coakley could even get off the stoop and around to the area.
Fourth, there is no evidence Washington had no other probable means of avoiding the danger than to shoot Victim. The evidence concerning the fight engaged in between Washington and Victim shows only that Washington hit Victim. There is nothing to indicate Victim ever placed Washington in a position that required him to shoot Victim in order to avoid the danger of losing his own life or sustaining serious bodily harm. See State v. Lockamy , 369 S.C. 378, 383-84, 631 S.E.2d 555, 558 (Ct. App. 2006) (holding, because appellant was no longer in danger when he fired the shot at the victim, he failed to meet the fourth element of the defense-that he had no other probable means of avoiding the danger-and, accordingly, was not entitled to a charge on self-defense). Further, the only evidence concerning Washington's participation in the fight shows Washington had the opportunity, and in fact did remove himself momentarily from the fight when he came up to the stoop and pulled a gun on Coakley. Thus, he could have retreated at that moment. See C. Jackson , 384 S.C. at 37, 681 S.E.2d at 21 ("Unless the incident occur[s] in the accused's **415 home or business or on the curtilage thereof, the accused generally has a duty to retreat."); H. Jackson , 227 S.C. at 279, 87 S.E.2d at 685 (holding one who pleads self-defense "must show that he had no other probable means of escape except to take the life of his assailant or stated another way, that he had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily harm than to act as he did in the particular instance; that it is one's duty to avoid taking human life where it is possible to prevent it even to the extent of retreating from his adversary unless by doing so the danger of being killed or suffering serious *481 bodily harm is increased or it is reasonably apparent that such danger would be increased"); Burriss , 334 S.C. at 268, 513 S.E.2d at 111 ("The law says if one can give back or step aside, or retreat without increasing his danger, and thus avoid taking human life, it is his duty to do so, and unless he has done so, it will not permit his plea of self-defense." (Burnett, J., dissenting) (quoting George , 119 S.C. at 121, 111 S.E. at 880 (1921) ) ).
Accordingly, we find there is no evidence to support any of the four requirements for a charge on self-defense and conclude the trial court did not commit error in refusing to charge the same.
V. Charge on Accomplice Liability
The solicitor requested the trial court charge the jury on the "hand of one is the hand of all." He argued the theory that Kinloch was the shooter had been presented in this case based on "multiple indications from the defense." He further argued, under the "hand of one is the hand of all" doctrine, if someone participates in an altercation, he is responsible for the end result, and even if Kinloch shot Victim, Washington was part of the assault. Defense counsel disagreed, arguing the State's theory was that Washington was the shooter, and though the defense tried to make suggestions or have the jury infer Kinloch was the shooter, there was no evidence in the record Kinloch shot anybody. Defense counsel reminded the trial court it had instructed the jury to strike Grant's testimony that Kinloch said "he did it." The trial court noted evidence from the bartender, Williams, in which Victim referred to "they"-Washington and Kinloch-as planning to kill Victim, and the State also noted there was evidence in the record that **416 "they" followed Victim out of the Club. Thereafter, the trial court charged the jury in part as follows:
If a crime is committed by two or more persons who were acting together in committing a crime, the act of one is the act of all. A person who joins with another to commit an unlawful act is criminally responsible for everything done by the other person which happens as a natural and probable consequence of the act-carrying out the common plan and purpose. For example, two people can be guilty of killing another person when only one of the two fired the shots that caused the death. If two or more people are together, acting together, assisting each other in committing the offense, the act of one is the act of all, or as it is sometimes said, the hand of one is the hand of all.
It further charged the jury the law concerning mere knowledge and mere presence, as well as the requirement of a prior arranged plan or scheme before one may be found guilty as a principal.
Washington argues the trial court erred in granting the State's request to charge the jury on accomplice liability, asserting the record is devoid of any evidence to support such a charge. He contends there is no evidence that a co-conspirator was the shooter and that he was acting with the co-conspirator when the crime took place. Washington maintains, although he attempted to introduce evidence that a co-conspirator shot Victim, the trial court refused to admit Grant's testimony that Kinloch stated he did the shooting. Washington cites to this court's decision in Wilds v. State , 407 S.C. 432, 756 S.E.2d 387 (Ct. App. 2014) arguing, like Wilds, it was error to give an accomplice liability charge in the absence of any evidence that someone else was the shooter. Washington also argues giving such a charge was confusing to the jury as evidenced by the fact that the jury requested clarification on the "hand of one is hand of all" law and maintains this confusion was also reflected in a later note from the jury that confused the "hand of one is the hand of all" doctrine with that pertaining to "acting in concert with the victim." Washington complains the trial court did not act to correct this confusion.[9]
*482 **417 "Under the 'hand of one is the hand of all' theory [of accomplice liability], one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." State v. Harry , 420 S.C. 290, 299, 803 S.E.2d 272, 276-77 (2017) (alteration in original) (quoting State v. Thompson , 374 S.C. 257, 261-62, 647 S.E.2d 702, 704-05 (Ct. App. 2007) ). "Under an accomplice liability theory, 'a person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act.' " State v. Condrey , 349 S.C. 184, 194, 562 S.E.2d 320, 325 (Ct. App. 2002) (quoting State v. Langley , 334 S.C. 643, 648-49, 515 S.E.2d 98, 101 (1999) ). "In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, but rather can prove the same by circumstantial evidence and the conduct of the parties." State v. Gibson , 390 S.C. 347, 354, 701 S.E.2d 766, 770 (Ct. App. 2010). "[A]n alternate theory of liability may only be charged when the evidence is equivocal on some integral fact and the jury has been presented with evidence upon which it could rely to find the existence or nonexistence of that fact." Barber v. State , 393 S.C. 232, 236, 712 S.E.2d 436, 439 (2011). Although a jury may have doubts about witness testimony, "an alternate theory of liability, such as accomplice liability, 'may not be charged merely on the theory the jury may believe some of the evidence and disbelieve other evidence.' " Wilds , 407 S.C. at 439, 756 S.E.2d at 390 (quoting Barber , 393 S.C. at 236, 712 S.E.2d at 438 ).
In Barber , evidence was presented that Barber and three other individuals-Kimbrell, Walker, and Kiser-gathered together and discussed plans to rob a minor drug dealer, Alan Heintz. 393 S.C. at 234, 712 S.E.2d at 437. The four individuals procured a semi-automatic handgun and drove to Heintz's house. Id. Upon learning more people than expected were at the house, the individuals left to procure a rifle and returned to the house. Id. Kimbrell remained in the vehicle while **418 Barber, Walker, and Kiser entered the house to rob the drug dealer. Id. Once inside, the three men demanded money and drugs. Id. One of the suspects, who was armed with a semiautomatic handgun, shot and killed Heintz and shot and wounded another man in the house. Id. at 234, 712 S.E.2d at 438. Kimbrell, Walker, and Kiser implicated Barber in the planning and execution of the robbery and as the individual who shot and killed the drug dealer. Id. at 234-35, 712 S.E.2d at 438. All three also testified at Barber's trial that Barber was armed with the semi-automatic handgun and had shot both victims. Id. at 235, 712 S.E.2d at 438. Testimony was presented at trial that only two guns were brought to the robbery, with Barber carrying the semi-automatic handgun and Kiser carrying a rifle. Id. However, defense counsel elicited testimony that Walker was also in possession of a semi-automatic handgun and all three of the men were armed-one with a rifle and two with semi-automatic handguns. Id. at 235, 237, 712 S.E.2d at 438, 439. Over defense counsel's objection, the trial court instructed the jury on accomplice liability. Id. at 235, 712 S.E.2d at 438. Barber appealed, arguing the charge was improper because the evidence presented at trial did not support a jury charge on accomplice liability as to the murder charge. Id. at 236, 712 S.E.2d at 438. Our supreme court disagreed, finding there was evidence to support the conclusion that Barber was acting with the other men during the robbery, and there was also evidence presented at trial to support a finding that one of the other robbers was the shooter. Id. at 237, 712 S.E.2d at 439.
In Wilds , the victim was robbed and shot while walking down a street. 407 S.C. at 435, 756 S.E.2d at 388. During the trial, evidence was presented from Wilds' co-defendants, Simmons and Dungee, that they were walking down the street with Wilds when they saw the victim walking toward them. Id. As they approached the victim, Wilds commented that he bet the victim had some money. Id. Additionally, Wilds told them before they saw the victim that he was "going to stick somebody or jack somebody," and Wilds had a pistol.
*483 Id. at 435-36, 756 S.E.2d at 388. When they met the victim on the road, while Wilds stopped to talk to him, Simmons and Dungee continued walking. Id. at 436, 756 S.E.2d at 388. After talking to the victim for a few minutes, Wilds pulled out a gun and **419 pointed it at the victim. Id. Thereafter, Wilds ordered Simmons and Dungee to hit the victim, which they did. Id. at 436, 756 S.E.2d at 389. Simmons and Dungee removed some items from the victim's pockets. Id. When the victim refused to let go of his wallet, Wilds shot him in the chest. Id. Wilds, Simmons, and Dungee ran, but stopped across the street from the scene, at which time Wilds gave Simmons and Dungee some money from the victim's wallet. Id. Simmons told Wilds he should get rid of the gun. Id. In his defense, Wilds presented alibi testimony from several of his relatives. Id. "During jury deliberations, the jury sent a note to the trial court asking, '[I]f we say [Wilds is] guilty of murder, are we saying he of the three [alone] actually pulled the trigger?' " Id. at 437, 756 S.E.2d at 389 (alteration in original). Over Wild's objection, the trial court responded to this question by instructing the jury on accomplice liability. Id. Following a post-conviction relief hearing, the PCR court found Wilds' appellate counsel was ineffective for failing to appeal the trial court's accomplice liability jury charge, and granted Wilds' application on that ground. Id. The State filed a petition for certiorari, arguing the PCR court erred in finding Wilds' appellate counsel was ineffective for failing to raise the issue of accomplice liability. Id. at 438, 756 S.E.2d at 390. This court affirmed the PCR court's grant of relief, citing the law in Barber -that "an alternate theory of liability may only be charged when the evidence is equivocal on some integral fact and the jury has been presented with evidence upon which it could rely to find the existence or nonexistence of that fact." Id. at 438-39, 756 S.E.2d at 390. We noted our supreme court found in Barber that the evidence presented at trial was equivocal as to who was the shooter, while in Wilds' case, there was no evidence to indicate anyone other than Wilds was the shooter. Id. at 439, 756 S.E.2d at 390.
Washington does not argue that there is no evidence he and Kinloch joined together to accomplish an illegal purpose or that the two aided, abetted, or assisted in the commission of a crime. Rather, he argues the accomplice liability charge was improper because there is no evidence an accomplice-Kinloch-was the shooter instead of him. In other words, Washington essentially maintains that there is no evidence to support the alternate theory of accomplice liability-that **420 he was an accomplice to Kinloch who was the shooter. Thus, the question becomes whether there was evidence adduced at trial that Kinloch, rather than Washington, shot Victim, such that Washington could be convicted on the basis of accomplice liability. We agree with the State that, unlike Wilds , there is evidence presented in this case to support an accomplice liability charge. We find this case more akin to Barber .
First, as in Barber , there is evidence to support the conclusion that the defendant, Washington, was acting with another in assaulting Victim, "join[ing] with another to accomplish an illegal purpose." Harry , 420 S.C. at 299, 803 S.E.2d at 276-77. Specifically, there was evidence that Washington and Kinloch were together at the Club that night; Washington continuously stared at Victim inside the Club and Kinloch and Washington were seen following Victim everywhere he went in the Club; Victim expressed to one of the witnesses that Kinloch was going to shoot him and that Kinloch and Washington were going to kill him; when Victim walked out the door that night, Washington and Kinloch walked out behind him; and Washington and Kinloch both got into a physical altercation with Victim outside the Club.
Second, as in Barber , there was evidence presented at trial that could support a finding that Washington had an accomplice who was the shooter. Aside from the above evidence that Washington and Kinloch joined together to assault Victim, evidence was presented that Kinloch stated in the detention center phone call that during the altercation that night he-Kinloch-"got [Victim] on the car." Additionally, defense witness Deveaux testified that as he was walking into the Club that night, he saw the individual who pulled off his shirt-Victim-standing in proximity to and in the opposite direction of Kinloch and heard them "fussing." As Deveaux went *484 through the first door of the Club and got to the second, he heard gunshots. Finally, the defense presented witness Robin-who testified Washington was not near the fight and Washington did not have a gun-and witness Singleton-who testified he was in the parking lot at the time of the incident, Washington was in his sight when he heard three shots being fired, and Washington was not anywhere near where the shots were fired and was in the road before the first shot was fired. **421 Accordingly, there was equivocal evidence as to who shot Victim, and from which the jury could have found Washington's accomplice was the shooter.
Based on the above, we find evidence was presented to support an accomplice liability charge and the trial court, therefore, did not err in giving such a charge. See Barber , 393 S.C. at 236, 712 S.E.2d at 439 (2011) (finding no error in the trial court's decision to give an accomplice liability jury instruction because "the sum of the evidence presented at trial, both by the State and defense, was equivocal as to who was the shooter").
VI. Allen Charge
The case was submitted to the jury at 11:55 a.m. At 4:58 p.m. that afternoon, the jury sent a note indicating it was deadlocked. The trial court indicated its intention to give the jurors an Allen charge and then release them for the evening. Defense counsel objected, stating he desired the Allen charge be given in the morning, and if the charge were given that night then the jury should go back and continue to deliberate the matter that night. He noted he was "contrary to an Allen charge and disbursement," he would prefer an Allen charge be given in the morning and the jury continue from there, and he was "leery" of the trial court's proposed approach. The solicitor stated he preferred the Allen charge be given that night and that they reconvene in the morning. The trial court noted defense counsel's objection but gave the jury an Allen charge at that time. Following the Allen charge, the trial court instructed the jurors to return in the morning to resume deliberations. It further admonished them that in breaking for the evening, they "must stop [their] deliberations," and they "must not consider any issue in this case until all twelve of [them] [were] back together."
Defense counsel noted he had no exception to the Allen charge itself, but he continued to object to the proposed procedure of allowing the jury to be disbursed and to commence deliberations in the morning. He argued "the whole integrity of these twelve people should be in line that they stay together until a decision has been reached." When asked by the court if he had any law to support his position, counsel **422 replied that all he had was his thirty-three years of experience and in similar situations they stayed "until the wee, wee hours in the morning." The trial court asked if defense counsel was requesting that the court send the jury back to continue deliberations, and counsel clarified he had no objection to the jury leaving. However, he noted he told the trial court before it gave the Allen charge that he preferred that not occur until the morning, and at that point his objection was to the fact that they had received the Allen charge that night and not that they were leaving that evening. The trial court stated that once the jury indicated it was unable to reach a verdict, she could not tell them to continue their deliberations without an Allen charge. The court noted it was after 5:00, it thought it best to break for the evening, and in order to break for the evening, the jury "had" to be given the Allen charge. When pressed by the trial court as to why he objected to the giving of the Allen charge that night, defense counsel stated, "[Y]ou have given instructions as a group now to ponder individually for the next twelve hours or more ...," and the jurors had been given instruction as a group to adhere to their own individual "moral conscientiousness," allowing them to disburse and ponder individually, not as a group.
The next morning, when the jury returned, the trial court asked the jurors if they had each complied with the court's "instructions over the evening hour," and the jurors indicated they had so complied. A little over five hours later, the jury returned a verdict finding Washington guilty of voluntary manslaughter.
Washington contends the trial court erred in giving an Allen charge at the close of the day's deliberations and then excusing the *485 jury for the night. He contends, contrary to the trial court's ruling, the law does not require the jury to be given an Allen charge before it could be sent home for the evening. He argues the practice in a situation like this is to send the jury home with instructions to return the next day and to give the Allen charge the next day immediately before the jury resumes deliberations. Washington cites two cases- Harvey v. Strickland , 350 S.C. 303, 566 S.E.2d 529 (2002) and State v. Tillman , 304 S.C. 512, 405 S.E.2d 607 (Ct. App. 1991) -as examples of cases in which the jury was excused for the day, but then brought back the next morning for further deliberations **423 following an Allen charge. Washington further argues the procedure adopted by the trial court was prejudicial, as it undermined the purpose of an Allen charge, which directs jurors to continue to deliberate and consult with each other. He contends the effect of the trial court's procedure was to separate the jurors and send them home to contemplate the case individually.
It does not appear our courts have addressed whether, when a jury indicates it is unable to reach a verdict late in the day, an Allen charge should be given prior to allowing the jury to go home and have the jury resume deliberations the following day, or whether the trial court should send the jury home without the Allen charge and then give the charge upon their return the next day before they resume deliberations. While Washington cites two cases that indicate the latter procedure was used, neither of those cases address the issue of the timing of the Allen charge. Harvey , 350 S.C. at 307-08, 566 S.E.2d at 532 ; Tillman , 304 S.C. at 521, 405 S.E.2d at 612. Rather, they are simply part of the procedural history of the case and do not provide any guidance on this issue. Though we believe this decision was in the discretion of the trial court,[10] we recognize that, if the procedure suggested by defense counsel was appropriate, the trial court may have committed an abuse of discretion in indicating it was required to give the Allen charge to the jury before releasing them that evening. See State v. Bryant , 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007) ("An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law ." (emphasis added) ).
However, because we do not believe Washington was prejudiced, we need not decide whether, under such circumstances, the trial court was required to give the Allen charge before releasing the jury for the evening and then allowing the resumption of deliberations the next morning. See Sinclair , 275 S.C. at 614, 274 S.E.2d at 414 ("In this State, the conduct of a criminal trial is left largely to the sound discretion **424 of the [trial court] and [an appellate] court will not interfere unless it clearly appears that the rights of the complaining party were abused or prejudiced in some way ." (emphasis added) ). Washington's argument concerning the impropriety of the process used by the trial court centers on concern that the purpose of the Allen charge was undermined when the jurors were charged and then went home for the evening because they were directed to continue to deliberate and consult with each other by the charge but were then separated and sent home to individually deliberate. However, review of the record reveals the trial court specifically instructed the jury at the end of the Allen charge that they must stop their deliberations at that point and could not consider any issue in the case until all twelve of them were back together to resume deliberations. "[J]urors are presumed to follow the law as instructed to them." State v. Grovenstein , 335 S.C. 347, 353, 517 S.E.2d 216, 219 (1999). Accordingly, we find no reversible error.
For the foregoing reasons, Washington's conviction and sentence are
AFFIRMED.
GEATHERS, J., concurs. MCDONALD, J., concurs in result only.

On cross-examination, Jenkins stated he was "ninety-five percent" sure Washington shot Victim. However, on recross-examination, Jenkins stated he could "a hundred percent say [Washington] shot [Victim]," and it was a fact that he saw Washington shoot Victim.

It appears the "she" Lockwood referred to was Coakley, but it is not clear if she was referring to Kinloch or Jenkins when she indicated "Larry" said they were fighting, too.

SLED ultimately did not perform an analysis on the kit collected from Washington due to the fact it was collected more than six hours after the incident.

The record indicates Kenneth Grant's full name is Kenneth Gordon Grant. Nevertheless, Washington and the State both refer to this witness as Quentin Kenneth Grant in their briefs and acknowledge this to be the same person referred to in Kinloch's testimony, wherein he denied stating to that individual that he had been the shooter.

Grant thereafter stated he never went back to the Club, claiming he went to Kinloch's house and that was where he saw Kinloch.

We note, although the trial court sustained the solicitor's objection and twice instructed the jury to disregard the testimony, Grant testified four times before the jury that Kinloch told him he had committed the shooting, with defense counsel patently eliciting the testimony after the trial court had already ruled it inadmissible.

In Parvin , this court found error in the admission of statements under the present sense impression exception because the witness gave no indication of the amount of time that lapsed between the alleged statements and the event. Id. at 504, 777 S.E.2d at 4.

While the State recognizes the solicitor objected to admission of the evidence based on Rule 404, it contends the trial court's ruling nonetheless reflects it sustained the objection based on Rule 403, SCRE.

Although the record contains the note Washington seems to refer to in this argument, there is nothing in the record to indicate defense counsel objected to the court's response to the note, raised any concern about jury confusion, or argued the note supported the impropriety of an accomplice liability charge.

See State v. Sinclair , 275 S.C. 608, 614, 274 S.E.2d 411, 414 (1981) ("In this State, the conduct of a criminal trial is left largely to the sound discretion of the [trial court] and [an appellate] court will not interfere unless it clearly appears that the rights of the complaining party were abused or prejudiced in some way.").