# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Sha'quille Washington, Petitioner.

Appellate Case No. 2018-001878

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Berkeley County
Kristi Lea Harrington, Circuit Court Judge

---

Opinion No. 27992
Heard March 11, 2020 – Filed September 2, 2020

---

## AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED

---

Jack B. Swerling, of Columbia, and Katherine Carruth Goode, of Winnsboro, for Petitioner.

Attorney General Alan McCrory Wilson, Senior Assistant Attorney General David A. Spencer, both of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

---

**JUSTICE JAMES:** Sha'quille Washington ("Petitioner") was indicted for the murder of Herman Manigault and was convicted of the lesser included offense of voluntary manslaughter. The court of appeals affirmed Petitioner's conviction. *State v. Washington*, 424 S.C. 374, 818 S.E.2d 459 (Ct. App. 2018). We granted Petitioner's petition for a writ of certiorari to review the court of appeals' decision. We hold the trial court erred in giving an accomplice liability instruction, and we hold Petitioner was prejudiced by this error. Therefore, we affirm in part, vacate in part, and reverse in part, and we remand to the circuit court for a new trial on the charge of voluntary manslaughter.

## I.      Factual and Procedural History

On August 25, 2013, a large crowd gathered at "A Place in the Woods," a nightclub in Huger, South Carolina. Herman "Trey" Manigault (the victim in this case) and his cousin, Larry Jenkins, were among those present. According to trial testimony, Manigault told multiple people that Petitioner and Larry Kinloch, Petitioner's uncle, were following him around the establishment and staring him down. Arianna Coakley, Manigault's girlfriend, testified Manigault told her he was about to "snap" because Petitioner kept looking at him. Aja Williams, the bartender, testified Manigault said to her, "[Kinloch] going to shoot me, they going to kill me."

At closing time, a multitude of club patrons, including Manigault, Jenkins, Kinloch, and Petitioner, exited the building to the parking lot. A fight ensued in the parking lot. Testimony as to the participants in the fight, the specifics of the fight, and the shooting of Manigault varied greatly between the State's witnesses, Petitioner's witnesses, and Petitioner's statement to law enforcement.

Jenkins testified he joined the fight after at least two people hit Manigault. He could not identify who those two people were, but he testified Petitioner was "out there" during the fight. Jenkins testified he heard gunshots near the end of the fight. He checked himself for wounds and saw Manigault on the ground. Jenkins testified he saw Petitioner holding a small silver revolver in his right hand and firing towards Manigault. He testified he was 100% sure Petitioner shot Manigault.

Ms. Coakley testified that moments before the shooting, Petitioner said something to Manigault. Coakley testified Manigault responded by asking Petitioner, "what's up" and Petitioner struck Manigault with his left hand. Coakley testified Manigault slid towards the ground and Petitioner continued to hit him. Coakley said she raised a glass beer bottle to hit Petitioner but backed down when

Petitioner held a gun to her face and said, "I ain't playing, I ain't playing." Coakley testified Petitioner turned and ran, and then she heard four gunshots.

Petitioner's written statement to the police was read to the jury. Petitioner stated he arrived at the club around 2:00 a.m. and spoke to "a few ladies." He stated he walked outside, heard a commotion, and saw three people fighting. According to Petitioner, "the victim" (presumably Manigault) walked off, and an unknown person Petitioner termed "the suspect" fired a shot from a revolver at Manigault. Petitioner said he was four to five feet away from them at this point. Petitioner stated he was several feet further away from them when he heard two more shots. Petitioner stated he called the police the next morning to give a statement and clear his name after his grandmother informed him people accused him of shooting Manigault.

Kinloch testified for the State and initially denied any participation in the fight, but he eventually described his involvement as holding onto Larry Jenkins without throwing any punches. During its questioning of Kinloch, the State played a nine-minute post-shooting recorded phone conversation between Kinloch and his incarcerated brother Patrick. The solicitor quoted portions of the call while questioning Kinloch, but neither the recording nor a transcript of it was introduced into evidence. Kinloch, clearly a reluctant witness, testified he did not remember the phone call, and he did not respond to many of the solicitor's questions about the call. Apparently, Kinloch told his brother he initially fought a big, "light-skinned dude" (probably Jenkins) and then "got [Manigault] on the car. Me and him going back and forth. Dow, dow, dow [referring to three gunshots]." Kinloch also apparently told his brother he saw Petitioner shoot Manigault.

During cross-examination, Petitioner pressed Kinloch to admit he was the one who shot Manigault. Kinloch denied he shot Manigault. Petitioner asked Kinloch if he told Kenneth Quinton Grant and Darlene Washington (presumably Petitioner's grandmother) he shot Manigault. Kinloch denied this as well.

Petitioner called Erin Presnell, M.D., the forensic pathologist who conducted Manigault's autopsy, to testify as to Manigault's blood alcohol content at the time of autopsy. Before the jury, Petitioner asked Dr. Presnell, "What was the alcohol level --," and the State interjected, "Objection, Your Honor. 404," obviously a reference to Rule 404 of the South Carolina Rules of Evidence. The trial court then held an

off-the-record bench conference[1] to discuss the issue. The trial court then excused the jury and sustained the State's objection, explaining, "There has been abundant testimony as to the fact that there was drinking or not drinking by the victim, and so I have excluded this testimony, but you may continue [with a proffer of the testimony]." During the proffer, Dr. Presnell testified Manigault "had a blood-alcohol level of .235," which she categorized as "high." She testified that while she "imagined" Manigault "acted intoxicated," she could not give an opinion as to "whether he was aggressive or subdued or what his actual mannerisms were." She testified such a high blood alcohol level could have resulted in impaired judgment. The record contains no argument from the parties as to why the testimony was or was not admissible, and the trial court did not further explain its ruling. The State argued to the court of appeals that the context of the trial court's ruling made it clear the trial court excluded the testimony as irrelevant under Rule 402, SCRE. The court of appeals held the testimony was irrelevant and further held that even if it was relevant, any probative value was substantially outweighed by the danger of unfair prejudice under Rule 403, SCRE. *Washington*, 424 S.C. at 406-07, 818 S.E.2d at 476. The court of appeals also held that even if the trial court erred in excluding the testimony, Petitioner suffered no prejudice because the jury found Petitioner guilty of only voluntary manslaughter, which carried with it a finding Petitioner acted with sufficient legal provocation. *Id.* at 407, 818 S.E.2d at 476.

Petitioner called Kevin Watson to testify, but the trial court refused to allow him to testify after concluding he disobeyed a pre-trial sequestration order. Three other witnesses called by Petitioner were Robin Williams, Tyson Singleton, and Kenneth Quinton Grant. Robin Williams testified she was talking to her cousin as they walked out of the club at closing time when she heard "a lot of fussing" and saw a young lady holding a glass bottle in Petitioner's face. According to Robin Williams, there was a van parked nearby. She testified there was a fight taking place on one side of the van, and Petitioner and the young lady were on the other side of the van. She testified Petitioner "never had a gun." She also testified she heard two gunshots about five seconds after she saw the lady holding the bottle in Petitioner's face and Petitioner "ran on the second shot." She testified she then heard two more

---

[1] During this trial, the trial court held over twenty off-the-record bench conferences after evidentiary objections had been made. After most of these conferences, neither the arguments of counsel nor the bases for the trial court's rulings were put on the record.

shots about three seconds apart but Petitioner was not anywhere near where those two shots were fired.

Tyson Singleton testified he was talking to Robin Williams in the parking lot when he heard three shots fired in the parking lot. He testified he did not see who fired the shots because a van blocked his view. He testified he saw Petitioner "in the road" next to some woods before the first shot was fired and Petitioner was nowhere near where any of the shots were fired. He also testified he saw Kinloch inside the club before closing time but did not see him in the parking lot after closing.

Petitioner called Kenneth Quinton Grant, Petitioner's second cousin and—according to Grant—Kinloch's best friend, to testify about a conversation Grant claimed he had with Kinloch after the shooting. Grant testified he was not present at the club when the shooting occurred; however, he testified he saw Kinloch at Kinloch's house twenty to twenty-five minutes after the shooting, and Kinloch admitted to him he shot Manigault. The State objected on hearsay grounds, and the trial court asked Petitioner if there was an exception to the hearsay rule that would allow the testimony. Petitioner responded, "[Kinloch] already testified. My God." Petitioner also argued Kinloch's statement to Grant qualified as a present sense impression under Rule 803(1), SCRE. The trial court sustained the State's hearsay objection and instructed the jury to disregard Grant's statement. Despite this ruling, Petitioner again asked Grant whether Kinloch admitted to shooting Manigault, and Grant confirmed. The State again objected, and the trial court again sustained the objection and instructed the jury to disregard the testimony.[2] Before the court of appeals, Petitioner argued Kinloch's admission to Grant was a prior inconsistent statement and therefore admissible as non-hearsay under Rule 801(d)(1)(A), SCRE.

During the charge conference, the State first argued it was entitled to an accomplice liability instruction because the defense tried to suggest Kinloch shot

---

[2] While this is not an issue in this appeal, during his cross-examination of Grant, the solicitor repeatedly challenged the veracity of Grant's testimony by referring to pre-trial conversations the two had about Grant's account. Since we remand this case for a new trial, we are compelled to note the court of appeals' well-reasoned holding in *State v. Sierra*, 337 S.C. 368, 379, 523 S.E.2d 187, 192 (Ct. App. 1999), that it is generally improper for the prosecutor to impeach a witness by referring to out-of-court statements allegedly made by that witness to the prosecutor.

Manigault.  The State argued to the trial court, "I don't believe there's any evidence in the record that Larry Kinloch was the shooter, but there's certainly been multiple indications from the defense during this trial that he was."  The "multiple indications" referred to by the State presumably consisted of (1) Petitioner's unsuccessful attempts to introduce Grant's testimony that Kinloch told Grant he shot Manigault and (2) Petitioner's cross-examination of Kinloch during which Petitioner pressed Kinloch (a) to admit he told Grant and Darlene Washington he shot Manigault and (b) to admit he was known on the streets as the shooter.  The State also argued that if a person is involved in an altercation, a defendant who participates in the altercation is criminally responsible for the end result.  On this point, the State argued, "even if it was Larry Kinloch that ultimately did shoot the victim in this case, the defendant was part of the assault."  Petitioner acknowledged he tried to introduce Grant's testimony that Kinloch told him he was the shooter, but Petitioner noted the trial court sustained the State's objections and instructed the jury to disregard Grant's testimony on that issue.

Over Petitioner's objection, the trial court charged the jury on accomplice liability.  Two hours into deliberations, the jury asked the trial court for clarification of the law on reasonable doubt, accomplice liability, and voluntary manslaughter.  A copy of the question is in the record, but the record does not reflect whether the trial court responded.  Three hours later, the jury sent a note to the trial court stating it was deadlocked.  The trial court gave the jury an *Allen* charge[3] and adjourned for the evening.  Three hours into deliberations the next morning, the jury asked the trial court its second question, "Can we use [accomplice liability] to support legal provocation for parties acting in concert with victim?  Would parties acting in concert with the victim constitute sufficient legal provocation towards actions against victim?"  The trial court responded in writing, "You have been given all instructions on the law in my charge to you.  Please continue your deliberations."  Approximately two hours after its second question, the jury found Washington not guilty of murder but guilty of the lesser included offense of voluntary manslaughter.

Petitioner appealed and presented six arguments to the court of appeals: (1) the trial court erred in excluding Kenneth Quinton Grant's testimony on hearsay grounds; (2) the trial court erred in excluding Dr. Presnell's testimony; (3) the trial

---

[3] *Allen v. United States*, 164 U.S. 492, 501-02 (1896) (allowing a supplemental jury instruction given by the trial judge to encourage a deadlocked jury to reach an agreement).

court erred in excluding the testimony of Kevin Watson; (4) the trial court erred in refusing to charge self-defense; (5) the trial court erred in instructing the jury on the theory of accomplice liability; and (6) the trial court erred in giving the jury an *Allen* charge. The court of appeals affirmed. *State v. Washington*, 424 S.C. 374, 818 S.E.2d 459 (Ct. App. 2018). This Court granted Petitioner a writ of certiorari on all issues except for the propriety of the *Allen* charge. As we will explain, the trial court erred in instructing the jury on accomplice liability, and Petitioner was prejudiced by this error. We therefore reverse Petitioner's conviction for voluntary manslaughter and remand to the circuit court for a new trial on that charge.

## II. Discussion

### A. Exclusion of Grant's Testimony

To give clear context to our holding that the trial court erred in instructing the jury on accomplice liability, we must first review the trial court's exclusion of the testimony of defense witness Kenneth Quinton Grant. Petitioner sought to elicit Grant's testimony that twenty to twenty-five minutes after the shooting, Kinloch told Grant he shot Manigault. However, the trial court excluded the testimony as inadmissible hearsay. Petitioner argues Kinloch's alleged statement to Grant that he shot Manigault was admissible as a prior inconsistent statement under Rule 801(d)(1)(A), SCRE. Petitioner also argues Kinloch's alleged statement to Grant satisfies both the present sense impression (Rule 803(1), SCRE) and excited utterance (Rule 803(2), SCRE) exceptions to the rule against hearsay.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. Under Rule 801(d)(1)(A), a prior inconsistent statement of a witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is [] inconsistent with the declarant's testimony." Here, Kinloch was the "witness" and the "declarant" referenced in Rule 801.

When the State objected on hearsay grounds to Grant's testimony about Kinloch's statement to him, the trial court asked defense counsel, "Is there an exception?" Defense counsel responded, "[Kinloch] already testified. My God." The trial court sustained the objection but suggested defense counsel might be able to ask the question without eliciting hearsay. Defense counsel then asked Grant, "[Kinloch] said he did it?" The State again objected on hearsay grounds, and the

trial court held an off-the-record bench conference, sustained the objection, and instructed the jury to disregard Grant's testimony on the point. Immediately afterwards, there was another bench conference. Then, defense counsel resumed questioning and again asked Grant if Kinloch told him he shot Manigault. After Grant answered in the affirmative, the trial court again sustained the State's hearsay objection and again instructed the jury to disregard the testimony. There is no record of the substance of the arguments or rulings that took place during these conferences.

The court of appeals questioned whether Petitioner's prior inconsistent statement argument is preserved for appellate review. *Washington*, 424 S.C. at 396-97, 818 S.E.2d at 471. The court of appeals correctly noted the importance of parties placing their arguments on the record to preserve them for appellate review and then concluded that even if the Rule 801(d)(1)(A) issue was preserved, the trial court did not abuse its discretion in excluding Grant's testimony because Petitioner had not laid a proper foundation under Rule 613(b), SCRE, while questioning Kinloch. *Id.* at 397-98, 818 S.E.2d at 471-72. We hold defense counsel's statement to the trial court that "[Kinloch] already testified. My God" did not preserve for appellate review the argument Kinloch's alleged statement was a prior inconsistent statement and therefore not hearsay under Rule 801(d)(1)(A). *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge. Issues not raised and ruled upon in the trial court will not be considered on appeal."). Consequently, we do not reach the issue of whether Petitioner laid a proper foundation under Rule 613(b) for the admissibility of Kinloch's prior inconsistent statement to Grant, and we vacate the portion of the court of appeals' opinion addressing the Rule 613(b) foundational issue.[4] Our holding on this issue shall not

---

[4] In many instances, bench conferences are necessary, and here, the trial court was attempting to maintain the flow of the trial by holding bench conferences instead of repeatedly sending the jury out of the courtroom. Even so, we stress the importance of placing on the record arguments and rulings that took place off the record, whether during a bench conference, in emails, or in chambers. As the court of appeals noted, "When a conference takes place off the record, it is trial counsel's duty to put the substance of the discussion and the trial court's ruling on the record." *Washington*, 424 S.C at 397, 818 S.E.2d at 471 (quoting *Smalls v. State*, 422 S.C. 174, 182 n.3, 810 S.E.2d 836, 840 n.3 (2018)). We also note that on remand, it is possible Rule 801(d)(1)(A) and Rule 613(b) can be properly employed to warrant the introduction of Kinloch's alleged statements to Grant and Darlene Washington. Ironically, if

preclude Petitioner, during retrial, from seeking admission of Kinloch's alleged statement to Grant under Rule 801(d)(1)(A) and Rule 613(b).

Petitioner also contends the court of appeals erred in affirming the trial court's ruling that Kinloch's alleged statement to Grant was not admissible under the present sense impression exception to the rule against hearsay. We agree with the court of appeals' analysis of this issue[5] and therefore affirm. "The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001). "An abuse of discretion occurs when the trial court's ruling is based on an error of law[.]" *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000) (quoting *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000)).

Likewise, we agree with the court of appeals' rejection of Petitioner's argument that Kinloch's alleged statement to Grant was admissible under the excited utterance exception to the rule against hearsay. *Washington*, 424 S.C. at 401-04, 818 S.E.2d at 473-74.

## B.      Accomplice Liability Jury Instruction

Over Petitioner's objection, the trial court instructed the jury on the theory of accomplice liability, also known as the theory of "the hand of one is the hand of all." The instruction consisted of the following points: a person who joins with another to commit a crime is criminally responsible for everything done by the other person which happens as a natural and probable consequence of the act; if two or more are together, acting together, and assisting each other in committing the offense, all are guilty; a finding of a prior arranged plan or scheme is necessary for criminal liability to attach to the accomplice who does not directly commit the criminal act; when an act is done in the presence of and with the assistance of others, the act is done by all. The foregoing is not the complete instruction given by the trial court, but it conveys the gist of the accomplice liability theory. Assuming an accomplice liability instruction was appropriate in this case, the instruction given by the trial court was correct.

---

extrinsic evidence of Kinloch's alleged statement is introduced, it could render moot the dispute over the accomplice liability instruction.

[5] *See Washington*, 424 S.C. at 399-401, 818 S.E.2d at 472-73.

The court of appeals held the trial court did not err in giving the accomplice liability instruction because "there was evidence presented at trial that could support a finding that Washington had an accomplice who was the shooter." *Washington*, 424 S.C. at 420, 818 S.E.2d at 483. The court of appeals observed that aside from evidence both Petitioner and Kinloch joined together to assault Manigault, there was evidence both Petitioner and Kinloch followed Manigault around the club that night. The court of appeals also cited witness testimony that Manigault and Kinloch were "fussing," and witness testimony that Petitioner was not anywhere near the fight when the shots were fired. Thus, according to the court of appeals, "there was equivocal evidence as to who shot [Manigault], and from which the jury could have found [Petitioner]'s accomplice was the shooter." *Id.* at 421, 818 S.E.2d at 484.

For an accomplice liability instruction to be warranted, the evidence must be "equivocal on some integral fact and the jury [must have] been presented with evidence upon which it could rely to find the existence or nonexistence of that fact." *Barber v. State*, 393 S.C. 232, 236, 712 S.E.2d 436, 439 (2011). In this case, there was evidence Petitioner was the shooter. There was also evidence Petitioner was not the shooter. The question becomes whether there was equivocal evidence the shooter, if not Petitioner, was an accomplice of Petitioner. Based on the evidence presented in this case, Kinloch is the only possible person who could fall into the category of Petitioner's accomplice. Therefore, if the record contains no evidence Kinloch was the shooter, then the accomplice liability instruction should not have been given.

The State argues Ariana Coakley's testimony that Manigault told her, "[Kinloch] going to shoot me, they going to kill me" was evidence from which a jury could conclude Kinloch was the shooter. We disagree, as this statement was not evidence Kinloch ultimately <u>did</u> shoot Manigault.

The State contends the testimony of Robin Williams and Tyson Singleton that they saw Petitioner running unarmed from the scene as shots were fired elsewhere creates an inference that someone other than Petitioner was the shooter. That is certainly true, but their testimony does not create any inference Kinloch—again, the only possible accomplice of Petitioner—was the shooter.

The State argues Kinloch admitted to his brother during the jailhouse telephone conversation that he was "strapped"—armed with a firearm—while at the club. We disagree with the State's characterization of the conversation. First, there is nothing in the record defining the term "strapped." Even if the term means

"armed," all we can glean from the record is that Kinloch told his brother <u>Petitioner</u> was strapped, and then said to his brother, "[y]ou know how we do." There is no evidence Kinloch told his brother he was armed the night of the shooting.

The State also contends Petitioner's aggressive cross-examination of Kinloch constituted evidence Kinloch could have been the shooter. The State points to Petitioner asking Kinloch on cross-examination to admit he—Kinloch—told Grant and Darlene Washington he was armed with a .357 Magnum and that he told both of them he shot Manigault. Kinloch denied these assertions. Similarly, Petitioner asked Kinloch to admit he—Kinloch—had been described "in the streets" as the shooter. Kinloch denied that assertion as well. While Petitioner very aggressively cross-examined Kinloch, the fact remains that counsel's questions and accusations were not evidence. Kinloch's refusal to admit to the statements and conduct attributed to him does not constitute evidence upon which the jury could rely to determine Kinloch was armed or that he was the shooter. Otherwise, the jury would be allowed to engage in speculation.

The State contends our reasoning in *Barber v. State*, 393 S.C. 232, 712 S.E.2d 436 (2011), supports its position that an accomplice liability instruction was proper in this case. We disagree. In *Barber*, the State presented evidence that Barber and three accomplices (Kimbrell, Walker, and Kiser) conspired to rob a drug dealer. The three accomplices testified Kimbrell remained outside the dealer's house while Barber, Kiser, and Walker went inside to do the deed. The accomplices testified Barber was armed with a .380 handgun, Kiser was armed with a rifle, and Walker was unarmed. The State also presented testimony that Kiser was the shortest of the three men who entered the dwelling. One of the robbers shot and killed the dealer and shot and wounded another man. Expert testimony established the shots fired inside the dwelling were from a .380 handgun. Two eyewitnesses inside the dwelling testified they could not identify the three intruders because the intruders' faces were covered. However, Barber elicited testimony that the shortest intruder (inferably Kiser) was armed with a rifle and that *both* of the other two intruders were armed with .380 handguns. *Id*. at 237, 712 S.E.2d at 439. This testimony placed a .380 handgun in Walker's hands, thus supporting the conclusion that either Walker or Barber was the shooter.

In *Barber*, we noted the propriety of an accomplice liability charge depended upon "whether there is any evidence that another co-conspirator was the shooter and Barber was acting with him when the robbery took place." *Id.* We held an

accomplice liability instruction was warranted because "the sum of the evidence presented at trial, both by the State and defense, was equivocal as to who was the shooter." *Id.* at 236, 712 S.E.2d at 439.

On the record before us, Kinloch was the only person who could have been Petitioner's accomplice. There was evidence Kinloch and Petitioner acted in concert in following Manigault around the club and giving him dirty looks, there was evidence Petitioner and Kinloch (and others) fought with Manigault and Jenkins, and there was evidence Petitioner shot Manigault. However, for an accomplice liability instruction to have been warranted, there must be some evidence in the record that Kinloch shot Manigault. In *Barber*, there was evidence Barber shot the victims, and there was evidence Barber's accomplice, Walker, shot the victims. Here, there was no evidence Kinloch was armed with a firearm, and there was no evidence Kinloch shot Manigault. Kinloch was aggressively questioned as to whether he was armed and whether he shot Manigault. He denied both assertions. Was Kinloch telling the truth? Perhaps not. However, as we observed in *Barber*, an alternate theory of liability may not be charged to a jury "merely on the theory the jury may believe some of the evidence and disbelieve other evidence." 393 S.C. at 236, 712 S.E.2d at 438.

*Wilds v. State*, 407 S.C. 432, 440, 756 S.E.2d 387, 391 (Ct. App. 2014), supports Petitioner's contention that an accomplice liability instruction was not proper. In *Wilds*, evidence was presented that Wilds and two confederates were walking down a street when Wilds spotted the victim and told his confederates he was going to rob the victim. The two confederates testified Wilds stopped to talk to the victim while they kept walking. They testified Wilds pulled a gun on the victim and demanded his wallet. Wilds then ordered his two confederates to beat the victim. They proceeded to do so, and Wilds shot the victim in the chest. *Id.* at 435-36, 756 S.E.2d at 388-89. In holding an accomplice liability instruction was improper, the court of appeals noted there was no evidence presented that anyone other than Wilds was the shooter and that his two confederates did not join in the robbery until after Wilds pulled a gun on the victim. *Id.* at 439-40, 756 S.E.2d at 390-91. The court of appeals observed, "Although the jury may have had doubts about [the two confederates'] testimony, an alternate theory of liability, such as accomplice liability, 'may not be charged merely on the theory the jury may believe some of the evidence and disbelieve other evidence.'" *Id.* at 439, 756 S.E.2d at 390 (quoting *Barber*, 393 S.C. at 236, 712 S.E.2d at 438).

Here, as in *Wilds*, the jury certainly may have doubted Kinloch's testimony that he did not shoot Manigault. However, since Kinloch was the only possible accomplice of Petitioner whose actions could result in criminal liability for Petitioner, there must be some evidence Kinloch shot Manigault. There was none.

The State also maintains the accomplice liability instruction was a proper "remedial instruction" in response to Petitioner's efforts to introduce inadmissible hearsay evidence from Grant that Kinloch told him he shot Manigault. There is no authority for the proposition that a "remedial" jury instruction may be given just in case a jury might consider evidence it has been specifically instructed by the trial court to disregard. Each time Grant testified Kinloch told Grant he shot Manigault, the trial court sustained the State's objection, ordered the testimony stricken, and instructed the jury to disregard it. Subsequently, the trial court began its instructions to the jury with this admonition:

> You are to consider only the evidence before you. If there was any testimony ordered stricken from the record, you must disregard that testimony. Mr. Foreperson, as I instructed you, you are not to allow any testimony that was stricken from the record to even be discussed in deliberations.

In a slightly different context, we have held that "[i]f the trial judge sustains a timely objection to testimony and gives the jury a curative instruction to disregard the testimony, the error is deemed to be cured." *State v. George*, 323 S.C. 496, 510, 476 S.E.2d 903, 911-12 (1996). Similarly, we have observed, "[a]n instruction to disregard incompetent evidence is usually deemed to have cured the error. Moreover, jurors are presumed to follow the law as instructed to them." *State v. Grovenstein*, 335 S.C. 347, 353, 517 S.E.2d 216, 219 (1999) (internal citations omitted). In this case, the jury was presumed to have followed the trial court's instruction to disregard Grant's testimony. We therefore reject the State's argument that the accomplice liability instruction was a proper "remedial instruction."

We also hold the trial court's accomplice liability instruction prejudiced Petitioner. The evidence that Petitioner shot Manigault was not overwhelming, as several witnesses testified Petitioner was not armed and was not in the immediate area where the shooting occurred. The insertion of the accomplice liability charge into the case invited the jury to speculate whether Kinloch—the only possible

accomplice of Petitioner—shot Manigault, when there was no evidence Kinloch was the shooter.[6]

## C. Remaining Issues

The court of appeals affirmed the trial court's refusal to give a self-defense instruction. *Washington*, 424 S.C. at 410-15, 818 S.E.2d at 478-81. We affirm the court of appeals. Of course, if the evidentiary landscape changes during re-trial, the trial court shall follow the settled principle that "[t]he law to be charged to the jury is determined by the evidence presented at trial." *State v. Gaines*, 380 S.C. 23, 31, 667 S.E.2d 728, 732 (2008).

The court of appeals affirmed the trial court's exclusion of Dr. Presnell's testimony regarding Manigault's blood alcohol level. *Washington*, 424 S.C. at 404-07, 818 S.E.2d at 474-76. Based upon the record before us, we affirm the court of appeals on this issue. However, on remand, the trial court shall consider the evidence as presented at that time and shall rule accordingly.

The court of appeals also affirmed the trial court's exclusion of the testimony of Kevin Watson. *Id.* at 407-10, 818 S.E.2d at 476-78. We find no error in the trial court's ruling and therefore affirm the court of appeals on this issue.

## III. Conclusion

For the foregoing reasons, we reverse Petitioner's conviction for voluntary manslaughter and remand for a new trial on that charge.

---

[6] Our determination of prejudice does not turn upon the fact that the jury asked two questions about accomplice liability. However, the questions merit mention. In its first question, the jury asked the trial court for clarification of the law of reasonable doubt, accomplice liability, and voluntary manslaughter. The record does not reflect the trial court's response, if any. In its second question, the jury asked the trial court if it could apply the theory of accomplice liability to parties acting in concert with Manigault, the victim. The trial court advised the jury it had been fully instructed on the law. The second question indicates the jury did not fully understand the accomplice liability theory, which has no application to those acting in concert with a victim.

**AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.**

**BEATTY, C.J., KITTREDGE, HEARN, JJ., and Acting Justice D. Garrison Hill, concur.**