# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Tammy Caison Moorer, Appellant.

Appellate Case No. 2018-001938

———————

Appeal From Horry County
Benjamin H. Culbertson, Circuit Court Judge

———————

Opinion No. 5987
Heard December 9, 2021 – Filed June 7, 2023
Withdrawn, Substituted and Refiled July 5, 2023

———————

## AFFIRMED

———————

Chief Appellate Defender Robert Michael Dudek and
Appellate Defender Lara Mary Caudy, both of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson and Senior
Assistant Attorney General David A. Spencer, both of
Columbia; and Solicitor Jimmy A. Richardson, II, of
Conway, all for Respondent.

———————

**HILL, A.J.:** Tammy C. Moorer (Tammy) appeals her convictions for kidnapping
and conspiracy to kidnap. She argues the trial court erred in (1) failing to grant her
motion for a directed verdict; (2) admitting text messages that were sexually explicit
and referenced drug use; (3) allowing an expert in forensic video analysis to testify
the Moorers' truck was the vehicle videotaped going to and from the area where

Victim was last known to be; (4) excluding her alibi witnesses because she failed to comply with Rule 5(e)(1), SCRCrimP; and (5) excluding several defense witnesses because they violated the sequestration order. We affirm.

## I. FACTS

Heather Elvis (Victim), a twenty-year-old woman from Myrtle Beach, disappeared on December 18, 2013. The last known phone call Victim made was to Tammy's husband, Sidney Moorer, a thirty-eight-year-old man with whom she had a months' long affair that had ended on November 2, 2013. The phone call was made at 3:41 a.m. from the area of the Peachtree Boat Landing on the Waccamaw River. Victim's unoccupied car was discovered at the Landing at 4:00 a.m. by an officer on routine patrol. The next day, when her car remained abandoned at the Landing, the police contacted Victim's father, and a search for Victim began. Victim has never been found.

Based on Victim's phone records, a search of her apartment, and statements from her coworkers and roommate, it became apparent Victim may have been pregnant with Sidney's child, and Sidney became the prime suspect in Victim's disappearance. On December 20, 2013, the police visited Sidney's home, roughly a five-minute drive from the Landing. Sidney lived there with Tammy and their three children. Tammy's mother, father, and sister lived next door. The police discovered the Moorers had a home surveillance system that Tammy advised did not work and a black Ford F-150 truck that Tammy told police could not be unlocked at the time. Police observed a bag of cement, a spent shotgun shell, and a bottle of cleaning fluid piled by the Moorers' parked camper. The day after this police visit, Sidney purchased a new home surveillance system.

Investigators began to believe Tammy was also involved in Victim's disappearance. Phone records and location data from the Moorers' two iPhones revealed a grim picture of a wife irate with her husband for having an affair with a much younger woman; who threatened Victim upon discovery of the affair; who desired to punish Sidney; who took control of Sidney's iPhone on November 2, 2013, when she discovered the affair; who sexted other men from Sidney's iPhone; who began accompanying Sidney on his shifts to complete maintenance work at restaurants around Myrtle Beach; and who began stalking Victim.

Cell phone data showed Tammy sent the following text message to Victim shortly after Tammy discovered the affair: "You want to call me right now and explain yourself? It would be wise thing to do. . . . Save yourself. I'm giving you one last

chance to answer before we meet in person, only one. Hey, Sweetie, you ready to meet the Mrs., the kids want to meet you?" The State also presented several messages reflecting Tammy's anger at both Sidney and Victim for the affair, including a message to the Moorers' daughter that "[y]our dad is an evil, twisted freak and I am being punished for it" and a message from Tammy to her sister stating "that bitch is in hiding" in response to Tammy's sister's message that Victim was not at her place of work. Tammy's texts also stated that after the affair was uncovered, Sidney "had to stay chained to the bed until further notice while I live my life as a single woman." Another witness testified she saw Sidney restrained at home.

On the evening of December 17, 2013, six weeks after her affair with Sidney ended, Victim went on a date with a man her own age. During the date, Victim was happy and laughing. Her date dropped Victim off at her apartment after 1:00 a.m. on December 18, 2013. Meanwhile, Sidney and Tammy were, by their own admission, together. Location data from their iPhones indicated they were at Longbeard's Bar until 12:30 a.m. At around 1:15 a.m., Sidney purchased a pregnancy-test kit from Walmart. Sidney and Tammy then went to an area near a Kangaroo Express Gas Station. At 1:33 a.m., video from the Kangaroo Express showed Sidney leaving his truck and calling Victim for the first time since their affair ended—from a payphone at the Kangaroo Express. The call lasted four minutes and fifty seconds.

After receiving the payphone call, Victim called her roommate Brianna Warrelmann, who was out of town. Victim was upset and scared. Warrelmann calmed Victim down and told her not to call Sidney back or do anything rash. However, it appears Victim changed into her favorite outfit and—according to the location data from her cell phone—left her apartment at 2:31 a.m., arriving near Longbeard's Bar at 2:42 a.m. While in the vicinity of Longbeard's Bar, Victim called the Kangaroo Express payphone nine times. None of the calls were answered. Meanwhile, the cell phone evidence indicates Sidney and Tammy returned to their home.

After waiting at Longbeard's Bar for a while, Victim also returned home, where, at 3:16 and again at 3:17 a.m., she called Sidney's iPhone. The first call to Sidney's iPhone went to voicemail, but the second call lasted a little over four minutes. Location data from Victim's phone showed that after this call, Victim left her apartment and traveled to the Landing, a place where—according to an analysis of her cellphone location data—she was not in the habit of going. While at the Landing, Victim called Sidney's iPhone four more times: at 3:38 a.m., 3:39 a.m., 3:40 a.m., and 3:41 a.m. All four calls went to voicemail. The 3:41 a.m. phone call was the last one made from Victim's phone, and to this date, there has been no further activity on Victim's phone. There was no activity on the Moorers' iPhones between 3:30

a.m. and 4:00 a.m. However, at 4:37 a.m., Tammy texted Sidney for the first time since November 2, 2013, and Sidney texted back.

Police officers discovered that two surveillance systems located along a road that goes to the Landing had captured images of a pickup truck driving between the Moorers' home and the Landing in the early morning hours of December 18, 2013. One was a home surveillance system located five minutes from the Landing, which showed a dark pickup truck heading towards the Landing at approximately 3:45 a.m. and then returning nine minutes later. The second was from a business' surveillance system located two or three minutes from the Landing, which showed a dark pickup truck going towards the Landing at 3:39 a.m. and returning from the Landing at 3:46 a.m. (The time stamps of the videos are not synchronized to each other, so there was a few minutes' variation between them). The State asked a forensic video analyst, Grant Fredericks, to assist them in identifying the truck from the videos. After conducting many tests, including a "headlight spread pattern analysis," Fredericks formed the opinion the truck in the video footage was the Moorers' Ford F-150.

A Horry County Grand Jury indicted Sidney and Tammy for kidnapping and conspiracy to kidnap Victim on or about December 18, 2013. They were tried separately.

Before his trial began, Sidney moved to exclude Fredericks' expert testimony, and Tammy joined in the motion. Tammy and Sidney presented their own expert, Bruce Koenig, to dispute the reliability of Fredericks' opinion that the truck in the footage belonged to the Moorers. The circuit court qualified Fredericks as an expert but stated that any objections to the scope of his opinion could be raised at trial.

At Tammy's trial, the State moved to exclude any alibi evidence from Tammy's children, sister, and mother because Tammy did not comply with the alibi defense notice procedures outlined in Rule 5(e)(1), SCRCrimP. The trial court granted the motion. The trial court also granted Tammy's motion to sequester the witnesses.

During the trial, the State presented evidence from police investigators; a cellphone location data analyst; Victim's coworkers; Victim's roommate; the man with whom Victim went on her December 17, 2013 date; testimony indicating the Moorers' surveillance system was likely functional on the night of December 18, 2013; and over Tammy's objection, Fredericks' expert forensic video testimony. Also over Tammy's objection, the State presented the content of Tammy's sexually explicit text messages to a younger man, as well as messages mentioning her use of marijuana.

The State sought to paint the picture that, in the weeks before Victim's disappearance, Tammy was infuriated with Sidney for having an affair with Victim; did not respect Victim; was obsessed with Victim and the affair; sought revenge on Sidney; and, upon hearing the rumors that Victim was pregnant with Sidney's child, sought to dispose of Victim and her unborn child. The State's theory of the case was on the night of Victim's disappearance, Tammy had control over Sidney's iPhone and actions, and she and Sidney lured Victim to the Landing by asking Victim to take the pregnancy test they had purchased at Walmart. Police discovered an empty pregnancy test kit box at Victim's apartment. Tammy and Sidney destroyed their own incriminating surveillance camera footage from the night of the disappearance; and Tammy and Sidney had a "kidnapping kit" of cement and cleaning solution at the end of their driveway. The State noted Tammy returned Sidney's iPhone to his control for the first time in six weeks immediately after Victim disappeared. As a final piece of incriminating evidence, the State called Tammy's cousin Donald Demarino, who testified that, after Victim's disappearance, Sidney showed him a picture of Victim on a burner cell phone. Demarino explained that from the picture, it did not look like Victim could move or talk; he believed the picture was for Tammy; and based on the picture, he did not expect anyone to hear from Victim ever again. Demarino stated he did not tell anyone about the picture until he was imprisoned for an unrelated drug offense, but he did not receive anything in exchange for telling the State about the picture. Demarino admitted, however, he told his mother over the phone that this story was not true. He explained he did this to stop his mother from worrying.

After the State rested, Tammy moved for a directed verdict, arguing the State had not presented substantial circumstantial evidence to support the charges of kidnapping or conspiracy to kidnap. The trial court denied the motion.

Before the defense's case began, the trial court ruled that Tammy's children and mother had violated the trial court's sequestration order and excluded them from testifying.

During the defense's case, Tammy's sister testified Tammy texted her when Tammy and Sidney came home at 3:10 a.m. on December 18, 2013, and she then sent Tammy's children home when she saw the Moorers outside their door waiting for their children. Tammy testified she did not go to the Landing on December 18, 2013, and, to her knowledge, neither did the Moorers' Ford F-150. Tammy further testified she and Sidney were trying to conceive a child around the time of Victim's disappearance, and the pregnancy test purchased was for her. While in custody, Tammy received a positive pregnancy test at a local hospital on March 28, 2014,

showing she was almost seven weeks pregnant (she later miscarried). Tammy testified she was not angry with Victim and had quickly forgiven her; she had an open relationship with Sidney; and she and Sidney purchased the new surveillance cameras because her family was the object of harassment after Victim's disappearance.

The jury found Tammy guilty of both kidnapping and conspiracy to kidnap. The trial court sentenced her to concurrent sentences of thirty years' imprisonment for each charge.

## II. STANDARD OF REVIEW

In criminal cases, we review only for errors of law, and we are bound by the trial court's factual findings unless they are clearly erroneous. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

## III. DIRECTED VERDICT

Tammy argues the trial court erred in denying her motion for a directed verdict on her kidnapping and conspiracy to kidnap charges. Tammy asserts the State presented no direct or substantial circumstantial evidence Victim was kidnapped because there was no evidence of struggle at the Landing or in the Moorers' truck and the State's evidence raised only a mere suspicion she and Sidney were involved in Victim's disappearance. As to the conspiracy to kidnap charge, Tammy argues the State presented no evidence that she and Sidney conspired to kidnap Victim. We disagree.

The offense of kidnapping is defined by statute: "Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by his parent, is guilty of a felony . . . ." S.C. Code Ann. § 16-3-910 (2015). The act of inveigling or decoying alone can satisfy the unlawful act requirement of the kidnapping statute. *State v. East*, 353 S.C. 634, 637, 578 S.E.2d 748, 750 (Ct. App. 2003) ("South Carolina's kidnapping statute requires proof of an unlawful act taking *one* of several alternative forms, including . . . inveiglement[ or] decoy . . . ." (emphasis added)). "Inveigling has [] been defined as 'enticing, cajoling, or tempting the victim, usually through some deceitful means such as false promises.'" *State v. Stokes*, 345 S.C. 368, 373 n.6, 548 S.E.2d 202, 204 n.6 (2001) (quoting *United States v. Macklin*, 671 F.2d 60, 66 (2d Cir. 1982)). "The definition of 'decoy' is 'to lure successfully.'" *Id*. (citation omitted). Kidnapping "commences when one is

wrongfully deprived of freedom and continues until freedom is restored." *State v. Tucker*, 334 S.C. 1, 13, 512 S.E.2d 99, 105 (1999).

The offense of conspiracy to kidnap is also statutorily defined: "If two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of Section 16-3-910 and any of such persons do any overt act towards carrying out such unlawful agreement, confederation, or conspiracy, each such person shall be guilty of a felony . . . ." S.C. Code Ann. § 16-3-920 (2015).

The trial court did not err in denying Tammy's motion for a directed verdict as the State presented substantial circumstantial evidence of her guilt. *See State v. Owens*, 291 S.C. 116, 118–19, 352 S.E.2d 474, 475–76 (1987) (corpus delicti may be proven by circumstantial evidence in kidnapping prosecution); *see also State v. Lewis*, 434 S.C. 158, 166, 863 S.E.2d 1, 5 (2021) ("[O]n appeal from the denial of a directed verdict, an appellate court views all facts in the light most favorable to the nonmoving party."); *id*. ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." (quoting *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006))); *State v. Larmand*, 415 S.C. 23, 30, 780 S.E.2d 892, 895 (2015) ("If there is either any direct evidence or any substantial circumstantial evidence reasonably tending to prove the defendant's guilt, appellate courts must find that the trial judge properly submitted the case to the jury."). The State presented evidence Victim disappeared against her will, including: (1) Victim was a reliable worker, who typically notified her employer if she was going to miss work; (2) Victim did not take any of her belongings with her when she disappeared; (3) Victim has not used her phone—which her coworkers testified she kept with her at all times—since her disappearance; (4) Victim's car was left at the Landing; (5) shortly before her disappearance, Victim called Warrelmann, and Warrelmann testified Victim seemed "hysterical" after talking to Sidney and Warrelmann told Victim to not do anything rash or call Sidney back.

The State also presented substantial circumstantial evidence the Moorers kidnapped Victim, including proof that: (1) Tammy sent Victim and others angry texts about the affair during the six weeks preceding Victim's disappearance; (2) Sidney called Victim's manager, and Tammy took over the call, demanding that the manager fire Victim because Victim was "spreading rumors she was pregnant" by Sidney; (3) Sidney went to Walmart a few hours before Victim disappeared to purchase a pregnancy test when Victim was showing symptoms of pregnancy; (4) Tammy controlled both her and Sidney's iPhones from November 2, 2013, when she discovered the affair, until the early morning hours of December 18, 2013, when

Victim disappeared; (5) based on their iPhone location data, the Moorers' life pattern changed drastically after Tammy discovered the affair, and this change showed the Moorers' iPhones were increasingly located in the same vicinity as Victim—suggesting the Moorers were stalking Victim; (6) Tammy admitted she and Sidney were together in the early morning hours of December 18, 2013, when Sidney spoke to Victim from a payphone and later from his own iPhone; (7) Victim repeatedly called Sidney on the night of her disappearance, including at 3:41 a.m. when Victim's phone stopped reporting any data; (8) the Landing, which Victim's cell phone data showed she did not frequent, was only a short distance from the Moorers' home; (9) video surveillance from the morning of Victim's disappearance showed a dark truck going to and from the area of the Landing around the time of Victim's disappearance; (10) Fredericks, an expert in forensic video analysis, opined the truck seen in the surveillance videos was the Moorers' black Ford F-150; (11) there was evidence the SD card in the Moorers' truck had been removed, so no GPS data of the truck's movements was recorded during the time Victim disappeared; (12) someone with access to the Moorers' electronic devices ran a software program on November 13, 2013, and attempted to delete text messages, including threatening texts Tammy had sent to Victim; and (13) Sidney showed Demarino a picture of Victim after her disappearance depicting her unable to talk or move.

The State presented sufficient evidence that Sidney and Tammy conspired to kidnap Victim. Tammy and Sidney's iPhones' locations demonstrated they tracked Victim's whereabouts following Tammy's discovery of the affair. This and other evidence illustrated vividly that Sidney and Tammy were operating in tandem, focusing their joint attention on Victim before she vanished. Tammy controlled Sidney's iPhone from November 2, 2013, until the very hour of Victim's disappearance, when Sidney began using it again. Tammy admitted that she and Sidney were together in their Ford F-150 in the early morning hours of December 18, 2013, including at the payphone where Sidney called Victim on the night of Victim's disappearance. Demarino testified the picture of Victim Sidney showed him was "for Tammy."

Conspiracy often can only be proven by circumstantial means, as the crime often lurks in dark caverns, far from the light of day. We conclude there was evidence of a common design and mutual tacit agreement between Tammy and Sidney that went well beyond mere association or suspicion. *See State v. Fleming*, 243 S.C. 265, 274, 133 S.E.2d 800, 805 (1963). Given the timelines and conduct the evidence bore out, the Moorers' truck's path to the Landing was a fateful link in their long-laid plans, plans that required Sidney and Tammy's mutual cooperation. *See State v. Jeffcoat*, 279 S.C. 167, 170, 303 S.E.2d 855, 857 (1983).

Signs of struggle do not have to be present to prove the crime of kidnapping. In cases of inveigling or decoying, there may not be signs of struggle because the victim is tricked into going with his or her kidnapper willingly. *See Stokes*, 345 S.C. at 373, 548 S.E.2d at 204; McAninch et. al., *The Criminal Law of South Carolina* at 320 (6th ed. 2013) ("The act of kidnapping need not involve force. The victim could be inveigled or decoyed to her doom."). The State alleged the Moorers lured Victim to the Landing. Thus, the State did not have to prove the Moorers kidnapped Victim by force or prove there was a struggle. *See Ray v. State*, 330 S.C. 184, 188, 498 S.E.2d 640, 642 (1998) (kidnapping was proven when evidence showed the defendant inveigled victim into his truck under the pretense he was taking her to the hospital); *see also United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983) (providing the policy behind the kidnapping statute does not "justif[y] rewarding the kidnapper simply because he is ingenious enough to conceal his true motive from his victim until he is able to transport her" to another location). Accordingly, we affirm the trial court's denial of the directed verdict motion.

## IV.   ADMISSION OF TEXT MESSAGES AND OTHER PHONE DATA

The State presented messages from the Moorers' iPhones that referenced Tammy's use of marijuana. Tammy objected to these messages, arguing they amounted to character evidence barred by Rule 404, SCRE, and were unduly prejudicial under Rule 403, SCRE. The trial court admitted the messages, accepting the State's argument the messages demonstrated Tammy was not attempting to become pregnant before Victim's disappearance, and therefore, the pregnancy test purchased by Sidney on the night of Victim's disappearance was not for Tammy.

The State also presented proof Tammy conducted internet searches for the term "Cougar Life" and sent a series of sexually explicit messages from Sidney's iPhone to a much younger man on December 16, 2013. Tammy objected, arguing this evidence violated Rule 403 and was improper character evidence. The State asserted the messages showed Tammy had control of Sidney's iPhone as late as the day before Victim's disappearance, and the trial court allowed the messages. However, when the State went into excessive detail about the messages including that the young man's mother had called to ask why Tammy was messaging her underage son, Tammy objected again. The trial court sustained this objection, noting the details dealt "more with character and ha[d] zero probative value."

The State claimed they introduced the messages to show Tammy had control of Sidney's phone, Tammy was punishing Sidney for the affair, and their marriage was not open and happy as Tammy claimed. Although the trial court chastised the State

for the putting "salty materials that were pretty prejudicial that did get into the defendant's character" into evidence, it denied Tammy's motion for a mistrial.

Tammy argues the trial court abused its discretion in admitting the text messages that referenced marijuana use and were sexually explicit. *See State v. Hatcher*, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011) ("The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006))); Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent."); *State v. Faulkner*, 274 S.C. 619, 621, 266 S.E.2d 420, 421 (1980) ("While the State may not attack a criminal defendant's character unless he has placed it in issue, relevant evidence admissible for other purposes need not be excluded merely because it incidentally reflects upon the defendant's reputation." (citations omitted)).

Although the messages referencing drug use constituted prior bad act evidence, they were relevant and logically pertinent to the State's attempt to discount Tammy's testimony that she and Sidney were trying to get pregnant at the time of Victim's disappearance and that Sidney went to Walmart to purchase a pregnancy test for her, not Victim. *See Johnson v. State*, 433 S.C. 550, 860 S.E.2d 696, 699 (Ct. App. 2021) (stating in criminal cases, "the State must convince the trial court that the prior bad act evidence is logically relevant to a material fact at issue in the case: 'If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime'" (quoting *State v. Lyle*, 125 S.C. 406, 417, 118 S.E. 803, 807 (1923))); *see also State v. Perry*, 430 S.C. 24, 34, 842 S.E.2d 654, 659 (2020). The State's evidence showed Victim was possibly pregnant with Sidney's child at the time of her disappearance, and its theory of the case was that Tammy and Sidney lured Victim to the Landing in order to take a pregnancy test. Moreover, the State alleged Victim's possible pregnancy was also part of Tammy's motive to kill Victim, i.e., Tammy was already angry with Victim and Sidney for the affair, but her anger increased when she learned Victim may have been pregnant. While the State's presentation of Tammy's drug use was prejudicial, we find the prejudicial effect of these text messages did not substantially outweigh their probative value as to the State's theory of Tammy's motive.

Second, we find Tammy's internet searches for "Cougar Life" and her sexual text messages to a younger male were character evidence and, because the recipient may

have been underage, prior bad act evidence. However, this evidence was relevant and logically pertinent to show Tammy's motive for kidnapping Victim, her anger at Sidney for the affair, her desire for revenge against Sidney, and to prove she had control over Sidney's phone, which was used to lure Victim to the Landing. Both Tammy's motive and identity as one of the kidnappers were material issues of fact in this case, and thus, the probative value of this evidence was high.

Even if the trial court erred in admitting these messages, we find the error harmless given Tammy's statements–during police interviews and her testimony–that she and Sidney had an open relationship. Tammy's trial testimony also included gratuitous and vulgar descriptions of sexual acts.

## V. EXPERT WITNESS

The State called Grant Fredericks, who was qualified as an expert in video forensic analysis. Fredericks testified he used a process known as reverse projection analysis to form his opinion that the truck seen on the surveillance cameras on the road to the Landing between 3:35 a.m. and 3:45 a.m. on December 18 was in fact the Moorers' truck.

On appeal, Tammy does not quibble with Fredericks' qualifications or his methodology, but she claims the trial court erred in allowing Fredericks to testify to his identification of the Moorers' truck because the opinion was unreliable. The State claimed Tammy did not preserve this issue, but she did. We do, however, disagree with her argument that Fredericks' opinion lacked sufficient reliability.

Before admitting expert testimony, trial courts, as the gatekeepers of evidence, must ensure the proffered evidence is beyond the ordinary knowledge of the jury; the witness has the skill, training, education, and experience required of an expert in his field; and the testimony is reliable. *Watson v. Ford Motor Co.*, 389 S.C. 434, 445–46, 699 S.E.2d 169, 174–75 (2010); Rule 702, SCRE. In South Carolina, a trial court minding the Rule 702 gate must assess not only (1) whether the expert's *method* is reliable (i.e., valid), but also (2) whether the *substance* of the expert's testimony is reliable. *See State v. Council*, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999) (trial court must determine whether underlying science is reliable); *Watson*, 389 S.C. at 446, 699 S.E.2d at 175 ("[T]he trial court must evaluate the substance of the testimony and determine whether it is reliable."). South Carolina has not adopted *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–95 (1993), by name, nor has it revised Rule 702, SCRE, to incorporate the *Daubert* framework. Nevertheless, our approach is "extraordinarily similar" to the federal test. Young, *How Do You*

*Know What You Know?*, 15 S.C. Law. 28, 31 (2003); *see also State v. Phillips*, 430 S.C. 319, 343–44, 844 S.E.2d 651, 664 (2020) (Beatty, C.J., concurring).

Our state supreme court has set out four factors to be considered in determining the admissibility of novel scientific evidence: (1) publications and peer review; (2) prior application of the method to the type of evidence in the case; (3) quality control procedures utilized; and (4) consistency of the method with recognized scientific law and procedures. *State v. Jones*, 273 S.C. 723, 730–32, 259 S.E.2d 120, 124–25 (1979); *see also State v. Mealor*, 425 S.C. 625, 647–48, 825 S.E.2d 53, 65–66 (Ct. App. 2019). "The trial judge should apply the *Jones* factors to determine reliability." *Council*, 335 S.C. at 20, 515 S.E.2d at 518.

The substance of an expert's testimony is reliable if it adheres to the rigors of the method. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). As long as the trial court is satisfied the expert's testimony consists of a reliable method faithfully and reliably applied, the gate of admissibility should be opened. The correctness of the conclusion reached by an expert's faithful application of a reliable method (and the credibility of the expert who reached it) is for the jury, for the trial judge must remain at the gatepost and not tread on the advocate's or the jury's turf. *See State v. Jones*, 423 S.C. 631, 639–40, 817 S.E.2d 268, 272 (2018) ("There is always a possibility that an expert witness's opinions are incorrect. However, whether to accept the expert's opinions or not is a matter for the jury to decide. Trial courts are tasked only with determining whether the basis for the expert's opinion is sufficiently reliable such that it be may offered into evidence.").

Fredericks testified that reverse projection is a form of photogrammetry, which is a process to conduct measurements by using the reflection of light to determine the shape, size, and distance of objects. He explained that, as used in this case, reverse projection photogrammetry "is the examination of reflective patterns off the vehicle and off the headlight spread pattern, that is the headlight projection onto the roadway." He stated he had used these methods and techniques for over thirty years and had tested them with his peers. He distinguished his technique from mere "eyeballing" video images for comparison, explaining that the method involves the technical science of analyzing the compression involved in the production of the video images. Fredericks elaborated that comparing video images by "eyeballing" can lead to error because the viewer does not have the experience to test the comparison by taking compression into account. The scientific process of evaluating compression enables him to determine whether the video accurately reproduces the image. Fredericks further testified that he follows the methodology "universally

accepted" in the field of forensic identification for decades, known as "ACEVR: analyze, compare, evaluate, verify, and report."

Fredericks' testimony illustrated the verification and testing inherent in the method he employed. He stated that, although he is often consulted to identify a specific vehicle for a case, he can only do so less than ten percent of the time, mainly due to the low-quality resolution of the video evidence. He also related an episode that highlighted the testability and reliability of his method: he once opined that, after conducting the reverse projection analysis, the "questioned" vehicle was not the same model as the "known" vehicle, and it later transpired that he had not been furnished with the correct "questioned" vehicle. As to identifying a specific vehicle by headlight pattern spread analysis, Fredericks testified headlight spread pattern is one of the "very, very unique features of a vehicle," and has been the subject of numerous publications and testing. He noted he once tested sixty new vehicles of the same make and model and found all of their headlights reflected off the roadway in different ways.

In arriving at his opinion that the truck seen on the surveillance video riding to and from the Landing area between 3:35 and 3:46 a.m. on December 18, 2013, was the Moorers', Fredericks overlaid the images captured at that time on images captured by the cameras during a recreation using the Moorers' truck in February 2014, under similar light and other conditions. He concluded that the headlight pattern reflections off the roadway were identical in both videos. He then compared the reflective images from over a dozen other trucks, including some of the same make and model. None of them matched the headlight pattern seen on the December 18th video. Fredericks further reviewed images of some 3,910 trucks that the surveillance cameras had captured over several months and found none had the unique characteristics of the Moorers' truck.

Fredericks explained he had adhered to the "strict" methodology of ACEVR in reaching his opinion. He emphasized his opinion was not based exclusively on the headlight pattern analysis, but also on the analysis of the light reflections off various other parts of the truck and found the "reflections were identical and different from all of the other vehicles."

We conclude the trial court was well within its discretion in admitting Fredericks' identification testimony as a reliable expert opinion. Fredericks' expertise was based on his vast experience with forensic video analysis, as well as the facts that his report and conclusion in this case had been peer reviewed by another certified forensic video examiner and his headlight spread analysis was a peer reviewed technique.

The reliability of the reverse projection methodology was demonstrated by Fredericks' own experience. The text of Rule 702 states expertise can be based on experience. *See also Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

The reliability of expertise is often proven by its success. *See, e.g.*, *State v. White*, 382 S.C. 265, 271, 676 S.E.2d 684, 687 (2009) (dog handler deemed reliable in part because of his record of some 750 tracks with the same dog). A leading commentator has stressed that when an expert's opinion is based on inferences derived from historical facts (and that—along with the technical knowledge of how forensic video analysis and light reflections work–is essentially all reverse projection analysis is), a judge should measure reliability as follows:

> [T]he judge should insist on a foundation demonstrating that the expert's technique "works"; that is, the methodology enables the expert to accurately make the determination as to which she proposes to testify. The foundation must include a showing of the results when the technique was used on prior occasions. Do the outcomes demonstrate a connection between facts *A* and *B*?

1 *McCormick on Evid*ence § 13 (8th ed.) (2020). Fredericks' testimony about his successful results did precisely that. Our supreme court has emphasized the importance of empirical verification to reliability. *See, e.g.*, *State v. Chavis*, 412 S.C. 101, 108, 771 S.E.2d 336, 339 (2015) ("[E]vidence of mere procedural consistency does not ensure reliability without some evidence demonstrating that the individual expert is able to draw reliable results from the procedures of which he or she consistently applies."). To sum up, we hold the trial court did not err in admitting Fredericks' opinion as it satisfied the *Jones* factors and met the reliability standard of Rule 702.

## VI.   EXCLUDING DEFENSE WITNESSES

Before the defense began its case, the State asserted Tammy's children and mother had violated the trial court's sequestration order by watching a live feed of the trial. After an evidentiary hearing, the trial court ruled Tammy's mother and children had willfully and knowingly violated the sequestration order and excluded their testimony. Tammy asked to proffer the witnesses, but the trial court refused. Tammy later objected to the exclusion of the witnesses on due-process grounds,

asserting the suppression of her witnesses and their alibi testimony[1] prevented her from presenting a full defense.

Tammy asserts the trial court abused its discretion in excluding the testimony of her defense witnesses because it was an extreme and disproportionate remedy for the violation of sequestration order, especially, when it appeared the defense witnesses heard, at most, the testimony of two State witnesses on one morning of the trial. We disagree.

Whether the testimony of a witness who has violated the sequestration rule should be excluded depends upon the circumstances of the case and lies within the sound discretion of the trial court. *State v. Huckabee*, 388 S.C. 232, 241, 694 S.E.2d 781, 785 (Ct. App. 2010). "The purpose of the exclusion rule is . . . to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial; and if a witness violates the order he may be disciplined by the court." *State v. Washington*, 424 S.C. 374, 409, 818 S.E.2d 459, 477 (Ct. App. 2018), *aff'd in part, vacated in part, rev'd in part on other grounds*, 431 S.C. 394, 848 S.E.2d 779 (2020).

A proffer allows us to evaluate to what extent the exclusion of the testimony was prejudicial. *State v. Cabbagestalk*, 281 S.C. 35, 36, 314 S.E.2d 10, 11 (1984); *State v. Schmidt*, 288 S.C. 301, 303, 342 S.E.2d 401, 402–03 (1986). The trial court should have granted Tammy's proffer request, as that would have enhanced our review of the materiality of evidence, as well as the prejudicial effect of its exclusion. *State v. Jenkins*, 322 S.C. 360, 367, 474 S.E.2d 812, 816 (Ct. App. 1996) ("The reason for the rule requiring a proffer of excluded evidence is to enable the reviewing court to discern prejudice."). We do not need to reach the question of what prejudice Tammy experienced as a result of the exclusion of her witnesses because we believe the trial court was within its discretion to exclude their testimony.

---

[1] As for the trial court's exclusion of alibi testimony from Tammy's mother, children, and sister after finding Tammy did not give adequate notice of an alibi defense to the State pursuant to Rule 5(e)(1), SCRCrimP, we find this exclusion was not prejudicial because: (1) Tammy's sister testified that she saw Tammy arrive at her home at 3:10 a.m.; (2) Tammy's mother and children were excluded from testifying for violating the sequestration order; and (3) the State did not need to prove Tammy was at the Landing when Victim disappeared to prove Tammy lured Victim to the Landing or conspired with Sidney to lure Victim to the Landing. *See, e.g., Glover v. State*, 318 S.C. 496, 498, 458 S.E.2d 538, 540 (1995) (stating "a purported alibi which leaves it possible for the accused to be the guilty person is no alibi at all").

Here as in *Washington*, the trial court conducted an evidentiary hearing and made a specific finding that the State's witness, Deputy Pike, was credible. Deputy Pike detailed she observed Tammy's children and mother watching a live stream of the trial in the sequestration room. During the hearing, one of Tammy's children admitted he was watching YouTube on his cell phone, which meant he had access to the internet. This is important because several days before, the trial court had been confronted with someone in the sequestration room live-streaming the trial. At that juncture, the trial court exercised its discretion not to impose sanctions. Defense counsel affirmed that defense counsel had "made it clear that no one who is sequestered for the defense is allowed to have access to a device which could connect to the internet." In short, the sequestered witnesses were told what not to do and did it anyway, despite the first admonition. We find no error.

Consequently, we also reject Tammy's claim that the exclusion of her witnesses infringed her right to present a complete defense, thereby violating her right to due process. *See California v. Trombetta,* 467 U.S. 479, 485 (1984) (finding the Due Process Clause of the Fourteenth Amendment affords criminal defendants a meaningful opportunity to present a complete defense); *see also State v. Lyles*, 379 S.C. 328, 342, 665 S.E.2d 201, 209 (Ct. App. 2008) (finding the right to present a defense is not unlimited).

Tammy's convictions for kidnapping and conspiracy to kidnap are therefore

**AFFIRMED.**

**KONDUROS and HEWITT, JJ., concur.**